IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

CASE NOS. 24-3887, 24-3899, 25-3017

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ANITA GREEN,
AMANDA HOVANEC,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of Ohio
Western Division

---

BRIEF OF PLAINTIFF-APPELLEE

---

Amy Lee Copeland
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
Telephone No: (912) 807-5000
ALC@roco.pro

Benjamin S. Morrell
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone No: (312) 527-4000
bmorrell@taftlaw.com

Counsel for Defendants-Appellants

CAROL M. SKUTNIK
Acting United States Attorney

Laura McMullen Ford
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone No: (216) 622-3817
Facsimile No: (216) 522-7358
Laura.Ford@usdoj.gov

Counsel for Plaintiff-Appellee

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ............................................ix

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE.................................................................3

SUMMARY OF THE ARGUMENT ......................................................29

ARGUMENT .........................................................................................33

     I.     THE DISTRICT COURT PROPERLY DENIED GREEN AN
            ACCEPTANCE OF RESPONSIBILITY REDUCTION WHERE
            HER DISHONEST PLEA HEARING AND PRESENTENCE
            REPORT STATEMENTS SHOWED SHE DID NOT FULLY
            ACCEPT RESPONSBILITY FOR HER OFFENSE.........................33

     II.    THE DISTRICT COURT CORRECTLY ORDERED GREEN TO
            PAY RESTITUTION FOR THE MINOR VICTIMS'
            PSYCHOLOGICAL CARE................................................48

     III.   THE DISTRICT COURT DID NOT COMMIT PLAIN
            PROCEDURAL ERROR IN CONSIDERING HOVANEC'S
            MITIGATING FACTORS................................................58

     IV.   THE DISTRICT COURT CORRECTLY APPLIED A TWO-LEVEL
            ENHANCEMENT FOR HOVANEC'S AGGRAVATING ROLE...62

     V.    THE DISTRICT COURT PROPERLY APPLIED A TWO-LEVEL
            ENHANCEMENT FOR HOVANEC OBSTRUCTING THE
            INVESTIGATION. .......................................................68

     VI.   THE DISTRICT COURT IMPOSED A SUBSANTIVELY
            REASONABLE BELOW-GUIDELINES SENTENCE FOR
            HOVANEC'S PREMEDITATED MURDER OF T.H. ..................74

CONCLUSION ......................................................................................79

CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION.................80

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............81

# TABLE OF AUTHORITIES

## Federal Cases

Anderson v. City of Bessemer City, 470 U.S. 564 (1985) ............................... 59, 62

Armstrong v. Shirvell, 596 F. App'x 433 (6th Cir. 2015) ....................................57

Farris v. Barnhart, 147 F. App'x 638 (9th Cir. 2005)................................................63

Gall v. United States, 552 U.S. 38 (2007) ............................................ 58, 59, 74, 76

Gay v. Parsons, 61 F.4th 1088 (9th Cir. 2023) ........................................................62

Johnson v. United States, 559 U.S. 133 (2010) ................................................ 51, 52

MCP No. 185, 124 F.4th 993 (6th Cir. 2025).........................................................51

Molina-Martinez v. United States, 578 U.S. 189 (2016).................................. 35, 73

Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189 (1985) ........................51

Sorensen v. Barnhart, 69 F. App'x 864 (9th Cir. 2003) ..........................................63

United States v. Aleo, 681 F.3d 290 (6th Cir. 2012) ...............................................65

United States v. Anthony, 24 F. App'x 444 (6th Cir. 2001) ...................................39

United States v. Bolds, 511 F.3d 568 (6th Cir. 2007) .............................................75

United States v. Bostic, 371 F.3d 865 (6th Cir. 2004)............................... 35, 59, 68

United States v. Breshers, 684 F.3d 699 (7th Cir. 2012).........................................50

United States v. Caston, 851 F. App'x 557 (6th Cir. 2021) ............................. 34, 59

United States v. Childers, 86 F.3d 562 (6th Cir. 1996) .............................. 44, 45, 46

United States v. Church, 731 F.3d 530 (6th Cir. 2013)...........................................48

United States v. Coss, 677 F.3d 278 (6th Cir. 2012)...............................................43

United States v. Cotton, 535 U.S. 625 (2002) ........................................... 35, 36, 73

United States v. Curry, 536 F.3d 571 (6th Cir. 2008) .............................................75

United States v. Dayea, 73 F.3d 229 (9th Cir. 1995).........................................54, 55

United States v. Dotson, No. 99-6736, 2000 WL 1820375 (10th Cir. 2000)
    ................................................................................................50, 51, 52

United States v. Douglas, 634 F.3d 852 (6th Cir. 2011) .........................................51

United States v. Dunham, 295 F.3d 605 (6th Cir. 2002)..........................................69

United States v. Ely, 468 F.3d 399 (6th Cir. 2006) ..........................................33, 77

United States v. Estrada-Gonzalez, 32 F.4th 607 (6th Cir. 2022) ........ 34, 40, 41, 59

United States v. Gunter, 620 F.3d 642 (6th Cir. 2010)...........................................58

United States v. Guthrie, 144 F.3d 1006 (6th Cir. 1998)........................................36

United States v. Hakley, 101 F. App'x 122 (6th Cir. 2004)............................. 44, 46

United States v. Hall, 664 F. App'x 479 (6th Cir. 2016).........................................40

United States v. Henderson, 626 F.3d 326 (6th Cir. 2010) ........................ 41, 57, 74

United States v. Hernandez, 721 F. App'x 479 (6th Cir. 2018) ..............................34

United States v. Hicks, 997 F.2d 594 (9th Cir. 1993) ............................................53

United States v. Histed, 93 F.4th 948 (6th Cir. 2024) ......................... 68, 69, 71, 72

United States v. Jackson, 466 F.3d 537 (6th Cir. 2006) .........................................77

United States v. Jeter, 191 F.3d 637 (6th Cir. 1999) ................................. 45, 46, 47

United States v. Johnson, 934 F.3d 498 (6th Cir. 2019).........................................76

United States v. Lay, 583 F.3d 436 (6th Cir. 2009).................................................39

United States v. Lynde, 926 F.3d 275 (6th Cir. 2019)............................................76

United States v. McNulty, 597 F.3d 344 (6th Cir. 2010) ................................. 49, 50

United States v. Merritt, 102 F.4th 375 (6th Cir. 2024) ................................... 33, 34

United States v. Minter, 80 F.4th 753 (6th Cir. 2023).................................... passim

United States v. Nash, 65 F. App'x 546 (6th Cir. 2003) .........................................41

United States v. Nicolescu, 17 F.4th 706 (6th Cir. 2021)................................. 63, 67

United States v. Patel, 711 F. App'x 283 (6th Cir. 2017).........................................49

United States v. Patton, 651 F. App'x 426 (6th Cir. 2016) ......................................54

United States v. Pirosko, 787 F.3d 358 (6th Cir. 2015).........................................75

United States v. Plavcak, 411 F.3d 655 (6th Cir. 2005) .........................................51

United States v. Powell, 42 F. App'x 565 (4th Cir. 2002) ......................................55

United States v. Rayyan, 885 F.3d 436 (6th Cir. 2018).........................................75

United States v. Reichow, 416 F.3d 802 (8th Cir. 2005).........................................53

United States v. Rivera-Solis, 733 F. Supp. 3d 46 (D.P.R. 2024)................... 53, 54

United States v. Salyers, 592 F. App'x 483 (6th Cir. 2015)....................................65

United States v. Sengmany, 590 F. App'x 494 (6th Cir. 2014)..............................41

United States v. Sexton, 512 F.3d 326 (6th Cir. 2008)..................................... 33, 77

United States v. Sexton, 894 F.3d 787 (6th Cir. 2018)........................ 63, 64, 65, 67

United States v. Sharp, 927 F.2d 170 (4th Cir. 1991) ...........................................55

United States v. Smith, 782 F. App'x 383 (6th Cir. 2019)....................................35

United States v. Sosebee, 419 F.3d 451 (6th Cir. 2005).........................................49

United States v. Thomas, 933 F.3d 605 (6th Cir. 2019).........................................75

United States v. Tilford, 224 F.3d 865 (6th Cir. 2000) ..........................................46

United States v. Trevino, 7 F.4th 414 (6th Cir. 2021)...........................................43

United States v. Vance, 956 F.3d 846 (6th Cir. 2020)...........................................41

United States v. Vasquez, 560 F.3d 461 (6th Cir. 2009) ........................................65

United States v. Verduzco, 558 F. App'x 562 (6th Cir. 2014)...............................41

United States v. Vonner, 516 F.3d 382 (6th Cir. 2008)................................... 59, 60

United States v. Whitlow, 134 F.4th 914 (6th Cir. 2025)..........................................47

United States v. Wilcox, 487 F.3d 1163 (8th Cir. 2007) .................................. 53, 54

United States v. Williams, 952 F.2d 1504 (6th Cir. 1991) .......................................72

United States v. Winans, 748 F.3d 268 (6th Cir. 2014)..........................................48

United States v. Wolfe, 71 F.3d 611 (6th Cir. 1995).................................................39

United States v. Yellow Hawk, No. CR 17-50090-01-JLV, 2020 WL 4284369
    (W.D.S.D. Jul. 27, 2020) .................................................................................53

United States v. Zerpa-Ruiz, 784 F. App'x 353 (6th Cir. 2019) ...................... 39, 41

United States v. Zobel, 696 F.3d 558 (6th Cir. 2012) .............................................75

**State Cases**

State v. Nobles, 665 N.E.2d 1137 (Ohio App. Ct. 1995) ........................................58

**Federal Statutes**

18 U.S.C. § 3 ............................................................................................................10

18 U.S.C. § 831 ........................................................................................................52

18 U.S.C. § 1365(h)(4)(D)........................................................................................52

18 U.S.C. § 1864(d)(2)(D) ........................................................................................52

18 U.S.C. § 2118(e)(3)..............................................................................................52

18 U.S.C. § 3231 ........................................................................................................1

18 U.S.C. § 3553(a) ....................................................................................... 59, 75, 76

18 U.S.C. § 3661 ......................................................................................................44

18 U.S.C. § 3663 ......................................................................................................49

18 U.S.C. § 3663(a)(1)(A) ........................................................................................49

18 U.S.C. § 3663(a)(2)..............................................................................................49

18 U.S.C. § 3663(b)(2)................................................................ <u>passim</u>

18 U.S.C. § 3663(b)(2)(A) ........................................................ <u>passim</u>

18 U.S.C. § 3663(b)(2)(C) ........................................................ 54, 58

18 U.S.C. § 3742(a) ........................................................................1

21 U.S.C. § 841(a)(1)......................................................................9

21 U.S.C. § 841(b)(1)(C)................................................................9

21 U.S.C. § 952(a) ..........................................................................9

21 U.S.C. § 960(a)(1)......................................................................9

21 U.S.C. § 960(b)(3)......................................................................9

21 U.S.C. § 963 ..............................................................................9

28 U.S.C. § 1291 ............................................................................1

## State Statutes

Ohio Rev. Code § 2927.01(B) .....................................................58

## Federal Rules

Fed. R. App. P. 34(a)(2)(C) ........................................................ ix

## U.S. Sentencing Guidelines

U.S.S.G. § 1B1.3 ..........................................................................36

U.S.S.G. § 2B1.1, Applic. n.3 ....................................................37

U.S.S.G. § 3B1.1 ..................................................................... 64, 65

U.S.S.G. § 3B1.1(c) ................................................................. 31, 63

U.S.S.G. § 3C1.1 ............................................................... 68, 69, 72

U.S.S.G. § 3C1.1, Applic. n.4(D) ...............................................69

U.S.S.G. § 3E1.1(a)..................................................................................36

U.S.S.G. § 3E1.1, Applic. n.1(A) ..........................................................36

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellee, the United States of America, believes that the briefs and record adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional basis.  Defendant-Appellant Anita Green appeals the denial of an acceptance of responsibility reduction and Defendant-Appellant Amanda Hovanec appeals her aggravating role and obstruction of justice enhancements and the district court's conclusion about her psychological report. But well-established authority and the facts support the court's Guidelines calculations and consideration of Hovanec's mitigating factors in the psychological report.  Additionally, because the record shows that Hovanec's below-Guidelines sentence for importing and using a drug to kill the victim was substantively reasonable and the restitution statute supports the court's order for Green to pay restitution for the minor victims' psychological care, the government recommends that this Court decide this case on the briefs under Federal Rule of Appellate Procedure 34(a)(2)(C).

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction under 18 U.S.C. § 3231 over this case charging a federal criminal offense.  (R. 11: Indictment, PageID 85).  It entered final judgments against Defendants-Appellants Anita Green and Amanda Hovanec on October 3, 2024, and an amended judgment against Green with the court's restitution order on December 27, 2024.  (R. 137: Hovanec Judgment, PageID 3156; R. 138: Green Judgment, PageID 3163; R. 162: Green Amended Judgment, PageID 3491).  Green filed a timely notice of appeal from the original and amended judgments on October 9, 2024, and January 10, 2025, respectively. (R. 144: Notice of Appeal, PageID 3214; R. 164: Green Notice of Appeal, PageID 3716).  Hovanec filed a timely notice of appeal on October 14, 2024. (R. 147: Hovanec Notice of Appeal, PageID 3221).

This Court has jurisdiction over Green and Hovanec's consolidated appeals under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## **<u>STATEMENT OF THE ISSUES</u>**

I.      Whether the district court erred by denying Green an acceptance of responsibility reduction?

II.     Whether the district court correctly ordered Green to pay restitution for the minor victims' psychological care?

III.    Whether the district court committed plain procedural err in considering Hovanec's mitigating factors?

IV.     Whether the district court correctly applied a two-level enhancement for Hovanec's aggravating role?

V.      Whether the district court properly applied a two-level enhancement for Hovanec obstructing the investigation?

VI.     Whether Hovanec's below-Guidelines sentence is substantively reasonable for committing premediated murder?

## STATEMENT OF THE CASE

**A.    Introduction.**

In spring 2022, Amanda Hovanec, with help from her boyfriend, Anthony
Theodorou, and her mother, Anita Green, murdered T.H., Hovanec's estranged
husband and the father of their three small children.  Hovanec plotted with
Theodorou for over a year to kill T.H., who hindered her from moving with the
children from Ohio to South Africa to live with Theodorou.  At Hovanec's
direction, Theodorou shipped an animal tranquilizer, etorphine (M-99), from South
Africa to Hovanec at Green's Wapakoneta, Ohio residence.  During Theodorou's
Ohio visit a couple of months later, Hovanec ambushed T.H. with an etorphine-
filled syringe as he removed child booster seats from his car.  Green meanwhile
distracted the children inside her residence as Hovanec murdered their father in the
driveway.  Green then helped Hovanec and Theodorou dispose of T.H.'s body.

Unbeknownst to Hovanec when she killed T.H., his car's dash camera
captured his death and would lead to her, Green, and Theodorou's convictions and
sentences.  Because the district court properly calculated Green and Hovanec's
Guidelines ranges, considered Hovanec's mitigating circumstances in imposing a
procedurally and substantively reasonable below-Guidelines sentence for
Hovanec's offenses, and permissibly ordered Green to pay restitution for the
psychological injuries she caused the minor victims, this Court should affirm.

3

**B.      Hovanec dates Theodorou while living with T.H. in South Africa, files for divorce after returning to the United States, and plots with Theodorou to murder T.H.**

In November 2019, Hovanec began dating Theodorou while she was living with her husband, T.H., a State Department employee, and their children in South Africa.  (R. 135: Hovanec PSR, PageID 3103).  Hovanec returned to the United States with the children during the COVID-19 pandemic and filed for divorce, planning to return to South Africa to live with Theodorou.  (R. 160: Theodorou, Green Trans., PageID 3288-91).  After filing for divorce, Hovanec told Theodorou she wanted to kill T.H. and asked if he knew someone who "could assist."  (Id., PageID 3291-92).  Theodorou unsuccessfully tried to hire two hitmen and ultimately found someone who provided etorphine.  (Id., PageID 3293-302).

At Hovanec's request, Theodorou shipped the etorphine vial from South Africa to Hovanec by concealing it inside a galvanized metal object and putting it in a package with a hookah pipe, jewelry, and clothes.  (Id., PageID 3302; R. 163: Eilerman, Hovanec Trans., PageID 3563).  Hovanec received the package on March 1, 2022.  (R. 163: Eilerman, Hovanec Trans., PageID 3564).

**C.      Hovanec forcibly injects T.H. with etorphine that Theodorou supplied and holds T.H. down until he dies.**

During Theodorou's two-week visit at Hovanec and Green's residence two months later, Hovanec became upset when T.H. received court-ordered weekend visitation with his children on Friday, April 22, 2022, and discussed killing T.H.

4

with Theodorou and Green.  (R. 160: Theodorou, Green Trans., PageID 3306-13).

Green stood close behind Hovanec at their front door when T.H. returned the

children on Sunday, April 24, 2022.  (R. 163: Eilerman, Hovanec Trans., PageID

3529).  Unbeknownst to Hovanec at that time, T.H.'s car contained an outward

facing dash camera that recorded her exiting the house and Green "scurrying the

kids into the house."  (Id., PageID 3529-30).  "Almost immediately" after Green

closed the door, an audible scuffle occurred outside the camera's view.  (Id.,

PageID 3530).  T.H. referenced Hovanec forcibly injecting him in the shoulder

with the etorphine-filled syringe, exclaiming, "Did you just assault me?"  (Id.).

T.H. reached the camera's view and looked at it, as Hovanec pursued him

and knocked his cell phone from his hand.  (Id.).  As they approached Green's

garage, Hovanec wrestled T.H. "to the ground" and held him down "for quite some

time."  (R. 163: Eilerman, Hovanec Trans., PageID 3530).  When T.H. went limp,

Hovanec rose, removed an Apple watch from T.H.'s wrist, retrieved his phone, and

turned off his car.  (Id.; see also R. 135: Hovanec PSR, PageID 3104-05).

**D.    Hovanec and Theodorou bury T.H. with Green's help, but investigators find T.H.'s car with the murder video.**

After murdering T.H., Hovanec tried to hide incriminating evidence, such as

his body, car, and personal items.  Hovanec "prepared the body" in the garage with

"zip-ties and [a] plastic bag."  (R. 163: Eilerman, Hovanec Trans., PageID 3541,

3565).  At 7:51 p.m., T.H.'s car video captured Hovanec exclaim, "F**k, yeah,"

5

"[s]hortly after turning out of [Green's] driveway," en route to Dayton.  (Id.,
PageID 3544).  Another video showed Theodorou pulling up next to Hovanec
where they discussed wiping down T.H.'s car to remove their fingerprints before
abandoning it in Dayton.  (Id., PageID 3545).  When they returned from Dayton,
Green drove Hovanec and Theodorou to bury T.H.'s body and picked them up an
hour later.  (Id., PageID 3541-42; R. 160: Theodorou, Green Trans., PageID 3328-
29).

Investigators learned that T.H. was missing three days later, after he failed to
check out from his hotel.  (R. 163: Eilerman, Hovanec Trans., PageID 3521-22).
Cell tower information for his phone showed he was at Green's house for about 50
minutes shortly after 7:00 p.m., on April 24th.  (Id., PageID 3526, 3588).  But
Hovanec told investigators on April 27th that T.H. only stopped "there long
enough to drop the girls off."  (Id., PageID 3526).  Hovanec claimed T.H. may
have gone to Columbus or Dayton where he had skydiving friends.  (R. 163: Little,
Hovanec Trans., PageID 3611).  She also described T.H. as "detached from
reality," "narcissistic," "spiteful, [and] vengeful."  (Id., PageID 3612).

Green said during her simultaneous interview with investigators that T.H.
previously possessed "multiple" identifications containing his photograph and
other people's names.  (R. 160: Eilerman, Green Trans., PageID 3392).  Green also
expressed concern about T.H.'s whereabouts.  (Id., PageID 3392-93).

Investigators found T.H.'s car without a license plate in a "rough area" through cell tower data showing his phone's last location. (R. 163: Eilerman, Hovanec Trans., PageID 3526-28, 3620). Meanwhile, when interviewing Hovanec again, this time at the Sheriff's Department, Hovanec said after speaking with investigators earlier that day she texted T.H., telling him that police had the belongings he left at the hotel and "people were concerned about his whereabouts." (R. 163: Little, Hovanec Trans., PageID 3613-16). She also texted that "he needed to call as soon as possible." (Id., PageID 3616).

Midway through that interview, investigators learned that a dash camera video recovered from T.H.'s car showed Hovanec murdering him. (Id., PageID 3617-18). When confronted about that, Hovanec admitted injecting T.H.'s arm with a drug that she reportedly obtained from "a friend of a friend of a friend" in Columbus, which was supposed to stop T.H.'s heart "within two minutes" and "kill him." (Id., PageID 3618-19, 3628). Hovanec then claimed "Andre" from "jujitsu class" provided the drug and took T.H.'s body, before ultimately admitting that Theodorou mailed her the drug. (Id., PageID 3619-21).

Hovanec confessed to rolling T.H.'s body into the garage and transporting it to wooded property her grandfather previously owned. (Id., PageID 3621). She admitted putting bags over T.H.'s body so "no fluids would leak out," and burying

him "in a hole that she had dug that was filled with water." (Id.). She said that she made Theodorou dig the grave even though he did not want to do it. (Id.).

Rather than expressing remorse, Hovanec "blamed [T.H.] the whole time," faulting him for an alleged decade of abuse. (Id., PageID 3622, 3628). Hovanec admittedly knew "it was wrong to kill him," but had "no idea why's she's even apologizing." (Id., PageID 3622).

There were no police reports alleging that T.H. abused Hovanec, however. (Id., PageID 3610). And a record check for Green's residence revealed a single police report about Hovanec's father slapping her sister "across the mouth" in January 2001. (Id., PageID 3623-24).

When investigators confronted Theodorou about the video, Theodorou admitted that he and Hovanec planned to murder T.H. for "over a year" and it was "her idea" to inject T.H. with "M99." (Id., PageID 3535). Theodorou showed investigators a wooded, rural area that was not "easy to traverse," where T.H. was buried two-feet deep. (Id., PageID 3536-40). T.H. had "a plastic bag over his head," "his hands and his feet [] zip-tied," and a blue-green substance on his head and torso. (Id., PageID 3540-41). Investigators recovered T.H.'s body 36 hours after starting their investigation. (Id., PageID 3592-94).

Green admitted, after investigators confronted her about the murder video, that she knew about "the poison and that she was going to do something before

[T.H.] had arrived." (R. 160: Eilerman, Green Trans., PageID 3394). Green denied knowing that Hovanec had a syringe, but later acknowledged that Hovanec said she had one. (Id., PageID 3394-95). After repeated denials, Green eventually admitted transporting T.H.'s body to the burial location, but claimed Hovanec told her T.H.'s body was already loaded in the car. (Id., PageID 3395-98). Green also "made a big deal" about the investigators purportedly putting the word "poison" in her head, but Green herself first mentioned poison. (Id., PageID 3397-98).

**E.    Hovanec and Theodorou are charged with importing and distributing a drug that resulted in death, and Green is charged with being an accessory after the fact.**

On May 25, 2022, a Northern District of Ohio grand jury indicted Hovanec and Theodorou for conspiring to import a controlled substance, etorphine, from South Africa, in violation of 21 U.S.C. § 963, and a substantive controlled substance importation offense, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3), both with enhanced penalties for death resulting from using a controlled substance under 21 U.S.C. § 960(b)(3) (Counts 1 and 2). (R. 11: Indictment, PageID 85-86). Hovanec and Theodorou also were charged with conspiring to possess and substantive distribution of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846, both with enhanced statutory penalties for death resulting from using the controlled substance (Counts 4 and 5). (Id.,

PageID 87-88).  Green was charged with being an accessory after the fact, in violation of 18 U.S.C. § 3 (Count 6).  (Id., PageID 89).

## F.    Green quibbles with the scope of her knowledge when pleading guilty.

Green pled guilty without a plea agreement.  (R. 66: Plea Trans., PageID 604).  During her plea colloquy, the prosecutor stated the elements of her offense, including that Green "knew someone else had already committed the crime of distribution of a controlled substance that resulted in death."  (Id., PageID 610).  Green confirmed she understood that charge.  (Id.).

Later, the prosecutor described the factual basis, including Green's knowledge about the murder, as follows:

> On or about April 24th, 2022, Amanda Hovanec and Anthony Theodorou did knowingly and intentionally distribute a controlled substance to T.H. that resulted in T.H.'s death.  The defendant, Anita Green, knew that Amanda Hovanec and Anthony Theodorou had committed this crime and thereafter took steps to help them avoid being arrested, prosecuted or punished.

(Id., PageID 619).  Green agreed the "charges [were] correct."  (Id., PageID 620).

But when the court asked if she did what the government said, Green replied that she was "questioning the 'knowingly'" and denied knowing "what they did." (Id., PageID 620).  When asked, "did you know that they killed T.H.?" Green said, "I did, after the fact, yes," adding, "I just don't know how."  (Id.).

The court asked if Green knew, as she was charged, that her codefendants "killed T.H." (Id., PageID 621). Green again said, "after the fact, I knew that." (Id.). She further agreed that she helped Hovanec, who she knew "had killed T.H.," to prevent Hovanec from "being arrested" and charged. (Id., PageID 322).

After a defense requested recess, defense counsel said he believed that "terms like 'knowingly' ... [were] being blurred together." (Id., PageID 624-25). Based on defense counsel's discussion with Green, she appeared "prepared to acknowledge under the knowingly culpability—knowingly or should have known culpability, ... they are both being the same." (Id., PageID 626).

The court thus restated the offense's elements and confirmed Green's agreement that she knew Hovanec and Hovanec's "friend" "killed T.H" "in the driveway." (Id.). When the court asked if Green knew "they did it with some kind of drug that they imported," Green said, "After the fact, yes." (Id.). Green further agreed that she subsequently helped her codefendants avoid detection. (Id., PageID 627-28).

Green then pled guilty and the court found her plea to be knowing and voluntary. (Id., PageID 629-30). Counsel confirmed their satisfaction with the factual basis and Green's guilty plea. (Id., PageID 629, 633-34).

11

**G.    The presentence report recommends Guidelines enhancements for Hovanec's aggravating role and obstructing justice.**

The probation department filed a presentence report that found that Hovanec had a base offense level 43.  (R. 135: Hovanec PSR, PageID 3109).  It recommended that the court apply two, two-level enhancements for aggravating role and obstruction of justice, however, before a three-level reduction for acceptance of responsibility.  (Id., PageID 3107, 3109).  Hovanec objected to the recommended enhancements.  (Id., PageID 3121-22).

**H.    The district court finds that Hovanec had an aggravating role and obstructed justice.**

At Hovanec's sentencing, the court explained that Hovanec's punishment must encourage respect for the law, as it was difficult "to think of a crime that's worse" than the "premeditated, cold-blooded murder" of "the father of three little girls," "a son, a brother, an uncle, a guy in service to his country, ... doing important work for our government."  (R. 163: Hovanec Trans., PageID 3508-09). Hovanec's sentence therefore needed to provide adequate deterrence by being "severe enough" that Hovanec "would never be tempted to commit a similar crime again" and to protect the public from further crimes by Hovanec.  (Id., PageID 3509-10).  It also needed to deter others from murdering "their estranged husband and the father of their children" "in cold blood."  (Id.).  While this was "a one-off" offense, it was "a big one."  (Id., PageID 3512).  The court also recognized that

Hovanec "may have had some bad decisions ... some self-destructive tendencies," but she did not by comparison have "a 20-year criminal history." (Id., PageID 3512).

The court heard testimony about the investigation, including Hovanec and Theodorou's text messages that appeared to discuss Hovanec's "desire to hire a hitman" to murder T.H. (R. 163: Eilerman, Hovanec Trans., PageID 3557-60). Given the evidence, the government argued that the recommended enhancements should apply, first for aggravating role because Hovanec directed and controlled another person by asking Theodorou to find a hitman and telling him to help her bury the body, even though he did not want to do the latter. (R. 163: Hovanec Trans., PageID 3632). Hovanec also stood to gain financially the most from T.H.'s death. (Id., PageID 3633).

The government believed an obstruction of justice enhancement should apply because Hovanec wiped down T.H.'s car, removed and discarded the car's license plate, and abandoned it in a "rough area." (Id., PageID 3634, 3527, 3620). And "to thwart the investigation," Hovanec told investigators that T.H. may have gone to Dayton, where had skydiving friends. (Id., PageID 3634-35). The government also noted Hovanec's text message to T.H. between her interviews at Green's residence and at the Sheriff's Department, knowing "she already murdered him and buried him ... [to] throw the police off of her tail." (Id., PageID 3635-36).

13

Defense counsel believed <u>United States v. Minter</u>, 80 F.4th 753 (6th Cir. 2023), which held that an aggravating role enhancement required evidence the defendant had control over someone, was dispositive because such evidence reportedly was lacking here.  (<u>Id.</u>, PageID 3639-40).  Defense counsel believed the evidence instead showed that Theodorou simply agreed to whatever plan was discussed.  (<u>Id.</u>, PageID 3640).

When the court noted text messages that showed Hovanec appeared to control Theodorou and "direct[] him to do things," defense counsel cited Theodorou's presence in South Africa when he obtained the drug.  (<u>Id.</u>, PageID 3640-41).  While defense counsel believed that demonstrated Hovanec's lack of control, the court believed it appeared to be "her idea."  (<u>Id.</u>, PageID 3641).  Defense counsel countered that unsworn false statements to investigators about making them "do it" did not count unless they significantly impeded the investigation, which the defense disputed occurred there.  (<u>Id.</u>, PageID 3642, 3644).

The court agreed that "lying to the police and saying I didn't do it is part of the murder," but found that "at some point, we cross over that threshold and get into ... destroying evidence after the fact," including "ditching the stuff in dumpsters."  (<u>Id.</u>, PageID 3645).  The court found compelling Hovanec's "clear, affirmative act" of sending a text message "to a dead man's cell phone," after she

14

"talked to the police, trying to throw them off the scent," which was "an obstruction." (Id.). And absent the dash camera video, the court believed the defendants likely would have successfully concealed the murder. (Id.).

The government added that the Guideline's aggravating role criteria do not require the defendant to force someone to do something against their will. (Id., PageID 3650). Instead, the government contended that under Minter several factors were relevant, including exercising "decision-making authority, recruit[ing] accomplices, [and] receiv[ing] a large share of the profits." (Id., PageID 3649).

Additionally, the government believed that Hovanec engaged in a concerted concealment effort and her lack of success was irrelevant. (Id., PageID 3651). The government thus asked the court to apply enhancements for Hovanec's aggravating role and obstructing justice. (Id., PageID 3651-52). The government noted that she abandoned T.H.'s car in Dayton, where he "apparently [had] skydiving connections." (Id.). And absent Theodorou showing investigators the burial location, the government questioned the likelihood that police would have found T.H.'s body in an empty field, "178 feet in through brush," buried "two feet deep." (Id., PageID 3652-53). The government also believed it unlikely investigators would have known "the murder weapon" absent the video and Theodorou identifying the substance as "M99." (Id., PageID 3653).

The court found that an aggravating role enhancement applied based on Minter's consideration factors.  Hovanec recruited accomplices and would receive a larger profit share from the offense.  (Id.).  And "that was a specific motive" since she would have benefited financially and "by getting her children."  (Id.).  Hovanec also "exercised some emotional control over Theodorou" by manipulating him, which warranted the enhancement.  (Id., PageID 3654).

And the court believed Hovanec's concealment efforts would have succeeded even with investigators obtaining T.H.'s cell phone data because "they [still] wouldn't have had a body."  (Id.).  Still even with a body, etorphine was not "routinely tested for in toxicology," raising the likelihood a medical examiner would have concluded that T.H. died from "a heart attack."  (Id.).  The court thus found that Hovanec transporting T.H.'s "car to a bad part of town and then leaving it, destroying the evidence," and "quibbling" with investigators "about where the drug came from" supported the obstruction of justice enhancement.  (Id., PageID 3654-55).

The court therefore found based on the aggravating role and obstructing justice enhancements and acceptance of responsibility reduction that Hovanec had a total offense level 43, since an adjusted offense level 45 exceeded the 43-level maximum.  (Id., PageID 3662-63).  With a criminal history category I, Hovanec had a Guidelines range of life imprisonment.  (Id., PageID 3663).

16

## I.    The court imposes a below-Guidelines sentence for Hovanec's offenses.

The government argued that the court should impose a life sentence for Hovanec committing "premeditated," "cold-blooded murder."  (Id., PageID 3684-85).  Hovanec directed Theodorou to obtain the drug that she used to kill T.H. during divorce proceedings and a custody battle.  (Id., PageID 3686-87).  She ambushed T.H. and injected him with that drug for "the sole purpose of killing him," while her mother distracted the children inside the house.  (Id., PageID 3687).

The government noted that after Hovanec injected T.H., she "aggressively" knocked the phone from his hand and wrestled him to the ground, as he was striving to reach the camera's view.  (Id.).  She then held T.H. down "while he [took] his last breath."  (Id., PageID 3688).  Hovanec retrieved T.H.'s phone afterward, removed his watch, and turned off his car.  (Id.).  The government also referenced Hovanec's exclamation when "she turn[ed] the car back on to ditch it," showing an "astonishing," "utter lack of remorse."  (Id.).  Hovanec also "never ever said I'm sorry."  (Id.).

Nor did the government believe the court should give any weight to Hovanec's psychological report, which lacked any indication she could be rehabilitated.  (Id., PageID 3689).  The government thus believed a lifetime

sentence was necessary because Hovanec posed an ongoing risk. (Id., PageID 3689-90).

Defense counsel acknowledged that Hovanec's precalculated murder was "terrible," (id., PageID 3693), but requested a sentence less than life imprisonment because Hovanec previously experienced neglect, domestic violence, "alcoholism and pervasive fear" throughout "childhood" that affected her "development of sound decision-making and rational problem solving." (Id., PageID 3693). And Hovanec had been unable to "rise above it" in seeing "irrational dangers where others do not." (Id.). Defense counsel noted that "incarceration was the safest and most stable environment [Hovanec] had ever experienced in her life" and she would "continue to reassemble herself." (Id., PageID 3694).

At "35 years old," Hovanec would be in "her late 60s or early 70s" upon release if she received less than life imprisonment and defense counsel thus believed she would have a "negligible" recidivism risk. (Id.). With decades of BOP programming, defense counsel contended she would be a different person upon release. (Id., PageID 3695). Defense counsel also noted that lengthy incarceration of less than life imprisonment still would be a "harsh penalty." (Id.).

Hovanec told the court she "discover[ed] God" the last couple years, which helped her realize that her conduct was "selfish." (Id., PageID 3696). She had been "so desperate and determined to put an end to [her] own problems that [she]

failed to think about the man whose life [she] took" from her daughters and "his family."  (Id.).  Nor did not think "about the hurt and shame" she brought to her family.  (Id.).

Hovanec said she let her "abuse" and "fear turn [her] heart into resentment and hatred," and allowed it to distort her reasoning in turning to violence.  (Id.). She had "refused to give any forgiveness and [] lacked all self control."  (Id., PageID 3696-97).  She referenced her daughters "suffer[ing] their own abuse." (Id., PageID 3697).

She also acknowledged needing help, knowing "what has happened was wrong."  (Id.).  She took "full responsibility for what [she] did" and was "sorry for all the pain I have caused."  (Id.).

The government argued that the psychological report mostly related to Hovanec's unsubstantiated "self-reporting" with "no independent, objective, or reliable testing noted in the report," including Hovanec's "intelligence" or "functioning" levels, whether she was "malingering" or "truly suffers from autism."  (Id., PageID 3698).  It also was unclear whether the report's author watched the murder video or what reports if any she examined.  (Id., PageID 3698-99).  And there was no evidence Hovanec's children had been abused or that she was "trying to protect her children" in committing the murder.  (Id., PageID 3699).

The government further noted a police report about Hovanec's father backhanding her sibling.  (Id., PageID 3700).  Given that single report, the government questioned the scope of purported extreme home violence and resulting trauma.  (Id.).

The government noted that Hovanec's abuse allegations involving T.H. also were unsubstantiated and she continued to falsely blame T.H. for abusing her and their girls.  (Id.).  Based on her statement "in the psychological report that she would kill T.H. "if he ever hit the kids again," the government believed "she would do it again."  (Id., PageID 3701).  And her "real motive" in killing T.H. was to be "unencumbered by her husband and the father of her children" so she could return to South Africa and live with "her rich boyfriend."  (Id.).

Defense counsel countered that not all abuse is reported.  (Id., PageID 3702).  And given Hovanec's "lack of criminal history" and "propensity for this sort of behavior," defense counsel believed the court should find that she would not pose a danger to the public and deserved a sentence with "an out date."  (Id., PageID 3703-04).

The court found this case "the toughest [] I've ever had to work on," with countless "many tens of hours" already "spent agonizing about this case both in my office and, frankly, staring at my eyelids at night thinking about ... as [] bad of a crime as I've probably seen or could imagine."  (Id., PageID 3704).  The court also

acknowledged Hovanec's Guideline range of life imprisonment for "premediated

murder where the death penalty is not imposed." (Id., PageID 3705-06).

Here, it was "hard to imagine a crime more premediated and more thought

out and more carefully executed," making what Hovanec did to her three children

with the victim "tough" for the court "to reconcile." (Id., PageID 3705).  Hovanec

had no criminal record, but "literally, in cold blood, murder[ed] the father of [her]

children." (Id.).  While the court took Dr. Brams' report with not a "grain of salt,

but shaker of salt [] poured on it," it understood the report's author was "a hired

advocate" where the report "read[] a little bit like mitigation in a capital" case.

(Id., PageID 3705-06).  Although the court accepted that "at least a few missing

pieces in Ms. Hovanec's life" emerged "to get her to where she was" in

committing the offense, overall the court tended "to agree more than [] disagree"

with the prosecutor's report observations. (Id., PageID 3706).  In thus determining

a sentence reflecting that it was unacceptable "to solve a legal problem and a

domestic dispute with murder," the court varied "downward slightly from" the

Guidelines life imprisonment sentence to 480 months. (Id., PageID 3707-08).

**J.    Green claims her role in the offense was minimal, but evidence
discovered shortly before her sentencing shows that was untrue.**

Green's presentence report included an anticipated reduction to her

Guidelines offense level for acceptance of responsibility. (R. 136: Green PSR,

PageID 3132).  Green objected to the presentence report Guidelines calculations,

however, arguing that a minimal role reduction should apply because she purportedly "was completely unaware of the co-defendants' plan or its execution prior to being awakened and directed to transport the codefendants and the victim." (Id., PageID 3144).  She further claimed there was "no allegation that Green exercised any decision-making authority or influenced the decisions of other involved parties."  (Id.).

Green also claimed a departure for being under duress or coercion should apply because she reportedly was "completely unaware of what had occurred until she was awakened in the middle of the night and instructed to drive the codefendants and the victim to a nearby location."  (Id., PageID 3148).  Green allegedly was "in a state of shock" and "unable to immediately and fully process the information being conveyed as well as her response."  (Id.).

The government filed a sealed supplemental sentencing memorandum objecting to the presentence report's recommendation for an acceptance of responsibility reduction based on new information about Green's involvement. (R. 125: Sealed Gov't Supp. Sentencing Memorandum, PageID 2489).  That information began with Theodorou's February 6, 2024, proffer where he said Green not only knew about the murder plans beforehand, but revealed her greater involvement than the government previously had been led to believe, including that Green:

- Was present during murder discussions two days before Hovanec murdered T.H.;

- Suggested the burial location;

- Transported Theodorou and Hovanec to pre-dig T.H.'s grave; and

- Agreed to distract the children while Hovanec committed the murder.

(Id., PageID 2490).

Several months after those proffer statements, Hovanec submitted an amended presentence report statement corroborating that she and Theodorou pre-dug T.H.'s grave. (Id., PageID 2491 (discussing R. 135: PSR, PageID 3107-08)). The government thus argued that the evidence belied Green's insistence that she had no advance knowledge about the murder. (Id., PageID 2492).

As additional evidence of Green's greater involvement, the government cited Theodorou's proffer statement that after the murder, Green provided Hovanec a substance to decompose T.H.'s body. (Id., PageID 2490). And he said Green was present in the garage when he and Hovanec loaded T.H.'s body into Hovanec's car for Green to drive them to the pre-dug grave site. (Id.; see also R. 163: Eilerman, Hovanec Trans., PageID 3555). Green did not file a response.

**K.    The parties dispute Green's eligibility for an acceptance of responsibility reduction.**

Because Green had not fully admitted her knowledge of and involvement in the murder, the government objected to her receiving an acceptance-of-

23

responsibility adjustment.  (R. 125: Sealed Gov't Supp. Sentencing Memorandum, PageID 2489).  Green knew—before TH's murder—that Hovanec and Theodorou intended to kill him with poison.  Hovanec and Theodorou discussed this plan in Greene's presence a couple days before they executed it.  (R. 160: Theodorou, Green Trans., PageID 3311-13, 3350).  Hovanec also discussed Green distracting the girls with toys that Hovanec would buy to keep the girls occupied during the murder.  (Id., PageID 3312-13).

Theodorou testified that after he and Hovanec returned from buying those toys the next day, Green told Hovanec, "Let's take a drive."  (Id., PageID 3314).  Theodorou later learned that Green and Hovanec visited a possible burial site.  (Id., PageID 3314-15).  Ultimately, he and Hovanec decided that property located ten minutes away was better-suited.  (Id., PageID 3315-16).  Green then supplied them with boots and overalls and dropped them off at the location to dig T.H.'s grave.  (Id., PageID 3316-19).  As agreed, Green returned hourly to see if they were finished and drove them home afterward.  (Id., PageID 3319).

Theodorou testified that Green knew T.H.'s body was in her garage when he and Hovanec drove to Dayton to abandon T.H.'s car.  (Id., PageID 3326-27).  Green also was present when he and Hovanec loaded T.H. body into Hovanec's car.  (Id., PageID 3327-30).  Hovanec and Green previously discussed using an "inflatable trampoline they had on their pond" to wrap T.H.'s body.  (Id., PageID

24

3329).  And before leaving to bury T.H.'s body, Theodorou saw Green hand

Hovanec a Ziplock bag with "a powdered substance" that would expedite body

decomposition.  (Id., PageID 3330).  Hovanec poured that substance over T.H.'s

body before she and Theodorou buried him.  (Id., PageID 3330-31).

FBI Special Agent Andrew Eilerman confirmed that the "granular blue-

green substance" that Theodorou described was on T.H.'s body.  (R. 160:

Eilerman, Green Trans., PageID 3400-01).  And Eilerman testified that nothing

Theodorou said during his proffer had proven untrue, as investigators verified

some of his statements.  (Id., PageID 3401, 3415).  Eilerman also said there was no

evidence of Green's involvement in the murder scheme before April 22, 2022.

(Id., PageID 3407).

Based on Theodorou and Eilerman's testimony and the presentence report,

the government argued that "Green was substantially more involved than what she

has represented to th[e] Court."  (Id., PageID 3422-23).  The government cited

Green's lack of credibility during her plea colloquy when she claimed, "I don't

know what they did," in arguing that the court should deny an acceptance of

responsibility reduction.  (Id., PageID 3428-29).  The government further noted

that Green's plea colloquy insistence that she only knew about T.H.'s murder, and

"how" he was murdered, "after the fact" was "categorically false."  (Id., PageID

3429).  Even discounting Theodorou's testimony altogether, the government noted

that during Green's recorded interview, she admitted that Hovanec "told me there was poison" and that she had a syringe, which belied Green's sworn plea colloquy statements minimizing her knowledge.  (Id.).

Defense counsel countered that Green admitted her crime, including that she drove to the burial site.  (Id., PageID 3430, 3434, 3438).  He claimed the government's information was not new and argued the court should not credit Theodorou simply because of "the few things [he said] that were corroborated."  (Id., PageID 3430, 3435).

Defense counsel contended that Green taking the children inside before T.H.'s murder was consistent with preventing the children from seeing their parents argue.  (Id., PageID 3436-37).  Defense counsel also questioned why the government did not charge Green with planning the murder if early evidence indicated "she was engaged in the planning of this."  (Id., PageID 3437).  Defense counsel therefore did not believe it made "much sense" to deny Green an acceptance of responsibility reduction, where she pled guilty "early on with the representation ... that she would [] cooperate against her own daughter, if need be."  (Id., PageID 3439-40).

The government responded that acceptance was unwarranted because Green was "dishonest with [the Court] under oath at the change of plea hearing."  (Id., PageID 3444).  Although the government did not object to the reduction initially, it

26

did so after learning corroborating details from Hovanec's revised acceptance statement shortly before sentencing indicating "the grave was dug in advance." (Id.).

## L.     The court denies Green an acceptance of responsibility reduction and imposes a Guidelines sentence.

The court recalled Green being "very particular" during her plea colloquy about only knowing "anything after the fact." (Id., PageID 3445). The court found that Theodorou credibly testified about Green driving him and Hovanec "to dig the grave the day before" T.H.'s murder and found no "reason for him to lie about that." (Id.). It also cited the government's belief that Green knew "this plan was afoot" and drove Hovanec and Theodorou "to dig the grave the day before the murder," given Green's preindictment interview statements acknowledging "knowing about poison and not syringes and then syringes." (Id.). The court thus found troubling that Green "pars[ed] the word 'knowingly' and ma[de] a big deal about after the fact" when she pled guilty. (Id., PageID 3445-46).

The court believed it was the first time it had denied acceptance of responsibility, explaining that it could not recall someone "parsing relevant conduct like this the way that she did." (Id., PageID 3446). In hindsight it found that Green could "have been included as a potential co-conspirator." (Id.). And while the court "suspect[ed] [the parties'] disagree[d]" about Theodorou's credibility, the court found him truthful. (Id.). Even though he was "dishonest

27

from time to time on the stand when he said he didn't know what was going to happen as of Friday into Sunday," the court found Hovanec had nothing to gain in "acknowledging that Ms. Green was aware of this." (Id.). Because the court concluded that Green was not candid in "carefully [taking] apart the word 'knowingly'" during her plea colloquy, the court declined to grant an acceptance reduction, as "she was substantially more involved than [it] was led to believe at the time of her plea." (Id., PageID 3447).

The court thus found that Green had a total offense level 30, criminal history I, yielding a Guidelines range of 97 to 121 months. (Id.). In deciding Green's sentence, the court cited the murder video, which left "the inescapable conclusion that [Green] knew exactly what was going to happen in her driveway" in "swirling those three beautiful little girls into her house." (Id., PageID 3472; see also R. 108-1: Sealed Victim Statements, PageID 1713). The court imposed the high-end Guidelines, 121-month sentence. (R. 160: Green Trans., PageID 3473-75).

## M.    The district court orders Green to pay restitution.

The court also ordered Green to pay $126,000 in restitution, jointly and severally with Hovanec and Theodorou. (R. 161: Order, PageID 3485). The court recognized that the restitution statute authorized restitution where the offense resulted "in bodily injury to a victim," including ordering the defendant to pay for psychiatric and psychological care. (Id., PageID 3486). While the statute did not

define bodily injury, the court observed that two Circuits held on plain-error review that that term "include[s] psychological injury," while another found that the victim must have suffered both physical and emotional injury to warrant restitution for counseling.  (Id., PageID 3486-87).  Because the statute left the term undefined and "other criminal statutes include psychological injury in the definition of 'bodily injury,' the court found that term "can be read to encompass psychological injury."  (Id., PageID 3487).  The court therefore concluded that the minor victims' psychological injuries "constitute[d] 'bodily injury'" and ordered Green to pay restitution for their psychological care.  (Id.).

Green and Hovanec's consolidated sentencing appeals are now before this Court.

## SUMMARY OF THE ARGUMENT

The district court properly denied Green an acceptance of responsibility reduction where her dishonest plea hearing and presentence report statements showed that she had not fully accepted responsibility for her offense.  Green's presentence report statements falsely represented that she awoke to news of T.H.'s murder and was ordered to assist Hovanec and Theodorou while in a state of shock.  But the evidence showed she already knew about T.H.'s murder well before departing for the burial site and had the mental clarity to provide a decomposition aid to Hovanec.  Green's attempts to significantly minimize her

conduct in the presentence report therefore independently warranted denying the reduction.

Because Green also tried to mischaracterize a factual offense element—her knowledge—during her plea hearing, that provided an additional reason that supported denying the reduction. And contrary to Green's suggestion, the district court properly could consider her pre-indictment admission to federal investigators about knowing Hovanec had a syringe in gauging the veracity of her post-indictment statements, which it correctly found were inconsistent with accepting responsibility.

Additionally, Green's conduct caused qualifying bodily injury, and thus warranted the court's order to pay restitution for the minor victims' psychological care under 18 U.S.C. § 3663(b)(2)(A). That section's term, "bodily injury," includes psychological injury. And Green's granddaughters were victims because they suffered psychological harm from their mother murdering their father and Green helping conceal that. That also resulted in the minor victims experiencing physical manifestations, which satisfied Section 3663(b)(2)'s harm requirement, even if bodily injury were limited to physical harm as Green argues in contradiction to other criminal statutes that include mental injury as bodily injury. Moreover, Green arguably caused harm to the murder victim, T.H. by supplying a substance Hovanec used to decompose his body. And subsection 3663(b)(2)(A)

does not require a victim who suffered bodily injury to be the same victim receiving psychological care.  Thus, the court correctly ordered Green to pay restitution.

There was no error in Hovanec's sentencing either.  The court properly found that Hovanec's psychological report warranted some, but not much weight in determining her sentence.  The single police report involving her sibling contradicted Hovanec's claims of extensive childhood abuse, as well as accounts from two of five siblings that only repeated calls to the police mitigated home violence.  And the psychologist did not appear to conduct independent, objective, and reliable testing before simply accepting Hovanec's self-reported history.  The court's decision to credit the report in part therefore was not clearly erroneous.

The court properly applied a two-level enhancement under U.S.S.G. § 3B1.1(c), for Hovanec's aggravating role as an organizer, leader, manager, or supervisor of the plan to murder T.H. and to conceal it.  She recruited Theodorou to find a hitman, who supplied a lethal drug.  And she personally met with that hitman in South Africa.  She later directed Theodorou to ship the drug from South Africa to Ohio and used it to murder T.H.  She stood to benefit the most from T.H.'s death.  And she recruited Theodorou and Green to conceal T.H.'s  murder. Those facts amply justified the enhancement.

31

An obstruction-of-justice enhancement also applied because Hovanec committed several acts designed to impede or obstruct the missing person investigation. She concealed that T.H. did not leave her driveway alive that night by driving his car to Dayton, wiping it down, removing its license plate, and abandoning the car in a neighborhood that might make investigators suspect T.H. was carjacked. Hovanec then took T.H.'s body to a heavily wooded area and poured a decomposition aid on it before burial. And when speaking with investigators afterward, she provided a false narrative to explain T.H.'s possible whereabouts, which corresponded geographically with where investigators later found T.H.'s abandoned car. Then, to bolster her claimed ignorance about T.H.'s disappearance after her first interview with investigators, Hovanec sent T.H. a text message purportedly expressing concern about him, knowing she had killed and buried him many hours earlier. Her actions were designed to conceal her responsibility for T.H.'s death.

Accordingly, Hovanec's conduct amply justified the obstruction enhancement. And the court only applied it after hearing and responding to the parties' arguments. Nothing about that or the court's reasoning constituted plain procedural error.

Finally, the court's below-Guidelines 480-month sentence was substantively reasonable. Indeed, the egregious nature of Hovanec's premeditated murder of

T.H. easily would have justified the Guidelines lifetime imprisonment sentence. But the court nevertheless generously varied downward to 480 months based on its consideration of mitigating factors in the psychological report.  Hovanec's disagreement with how the district court weighed those sentencing factors is beyond this Court's review.  United States v. Sexton, 512 F.3d 326, 332 (6th Cir. 2008); United States v. Ely, 468 F.3d 399, 404 (6th Cir. 2006).  This Court therefore should affirm her sentence.

## **ARGUMENT**

I. **THE DISTRICT COURT PROPERLY DENIED GREEN AN ACCEPTANCE-OF-RESPONSIBILITY REDUCTION WHERE HER DISHONEST PLEA HEARING AND PRESENTENCE REPORT STATEMENTS SHOWED SHE DID NOT FULLY ACCEPT RESPONSBILITY FOR HER OFFENSE.**

### A.    Standard of review.

This Court has "pivoted from de novo to clear-error review" of a district court's decision denying an acceptance-of-responsibility reduction. United States v. Merritt, 102 F.4th 375, 379 (6th Cir. 2024).  Although some inconsistency still exists with applying de novo review to uncontested facts, when conducting "context-specific inquiry" to individual Guidelines for standard-of-review purposes, this Court nevertheless asks whether the sentencing or appellate court is "better positioned to answer the question posed by the Guideline at issue." Id. at 380 (cleaned up).  Because district courts are recognizably "better equipped

to tell when a defendant has sincerely accepted responsibility," which among other things, "seems akin" to a fact-based credibility finding, id., this Court applies clear-error review in that context and affords "great deference" to the district court's factual findings. Id. at 381 (cleaned up).

The "deferential clear-error standard requires" an appellate court "to defer to the district court's finding about what transpired 'even if [it] would have made the opposite finding,' so long as both stories are plausible on the record as a whole." United States v. Estrada-Gonzalez, 32 F.4th 607, 614 (6th Cir. 2022) (cleaned up). "[W]henever conflicting evidence permits a district court to make two 'permissible' findings, an appellate court must respect its choice of one finding over the other." United States v. Caston, 851 F. App'x 557, 560 (6th Cir. 2021) (cleaned up). As this Court has explained, "[t]o be clearly erroneous ... a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." United States v. Hernandez, 721 F. App'x 479, 483 (6th Cir. 2018) (cleaned up).

Additionally, the defendant "bears the burden of demonstrating that he accepted responsibility." Merritt, 102 F.4th at 381. Here Green's burden is even heavier because when the district court asked if Green had any procedural objections to the imposed sentence, Green only generally objected to the denial of an acceptance of responsibility reduction. (R. 160: Green Trans., PageID 3482-

83); see also United States v. Bostic, 371 F.3d 865 (6th Cir. 2004).  In particular, Green argued that she accepted responsibility for driving her co-defendants to the burial site, disagreed that Theodorou's statements as the basis for the government's objection to the reduction was "new," and challenged Theodorou's credibility. (Id., PageID 3430-31, 3434-42).  But she has not demonstrated that she specifically argued in the district court, as she does now, that the court could not rely on her pre-indictment statements in denying an acceptance reduction.  And where a defendant does "not object at the sentencing hearing to the test that the district court used" in denying acceptance of responsibility, this Court reviews "only for plain error" the defendant's first-time claim that the district court applied the wrong test.  United States v. Smith, 782 F. App'x 383, 387 (6th Cir. 2019).

Under that standard, Green must show:  "(1) [an] error, (2) that is plain, and (3) that affects substantial rights."  United States v. Cotton, 535 U.S. 625, 631 (2002) (cleaned up).  To demonstrate that an error affected substantial rights, Green must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different."  Molina-Martinez v. United States, 578 U.S. 189, 194 (2016) (cleaned up).  If Green demonstrates all three requirements, this Court "may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public

reputation of judicial proceedings."  <u>Cotton</u>, 535 U.S. at 631-32 (cleaned up).

Green cannot meet that demanding standard.

### B.    The Guidelines' acceptance of responsibility criteria.

The Sentencing Guidelines entitle a defendant who "clearly demonstrates

acceptance of responsibility for his offense" to receive a two-level sentencing

reduction.  U.S.S.G. § 3E1.1(a).  But a defendant does not earn the right to an

acceptance of responsibility reduction simply by pleading guilty; she has the

burden of showing, by a preponderance of the evidence, that the reduction is

justified.  <u>United States v. Guthrie</u>, 144 F.3d 1006, 1012 (6th Cir. 1998).

In determining whether a defendant qualifies for that reduction, a court

considers whether the defendant "truthfully admit[ed] the conduct comprising the

offense(s) of conviction, and truthfully admitting or not falsely denying any

additional relevant conduct for which the defendant is accountable under § 1B1.3

(Relevant Conduct)."  U.S.S.G. § 3E1.1, Applic. n.1(A).  While "a defendant is not

required to volunteer, or affirmatively admit, relevant conduct beyond the offense

of conviction in order to obtain a reduction under subsection (a)," "[a] defendant

who falsely denies, or frivolously contests, relevant conduct that the court

determines to be true has acted in a manner inconsistent with acceptance of

responsibility...."  <u>Id.</u>  And while a defendant's truthful admission to wrongdoing

"will constitute significant evidence of acceptance of responsibility ... this evidence

may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  Id., Applic. n.3.

### C.    Green's presentence report statements warranted denying an acceptance of responsibility reduction.

As a preliminary matter, whether the district court properly used Green's pre-indictment statements to deny an acceptance of responsibility reduction, as Green now argues, is unnecessary for this Court to resolve since an independent post-indictment and post-plea reason—Green's inconsistent denials in the presentence report—affirmatively supports the district court's decision.  Green's attempts to minimize her knowledge in her presentence report showed she had not fully accepted responsibility for being an accessory-after-the-fact.  See (R. 136: PSR, PageID 3144, 3148-49).  Her own post-plea statements, therefore, independently warranted denying a two-level reduction, particularly on plain-error review.

In arguing for a minimal role reduction in the presentence report, Green claimed she was "completely unaware of the co-defendants' plan or its execution prior to being awakened and directed to transport the codefendants and the victim." (Id., PageID 3144).  She repeated that claim in seeking a downward departure for duress or coercion because she reportedly "was in a state of shock and was unable to immediately and fully process the information being conveyed as well as her response thereto."  (Id., PageID 3148).

37

But Theodorou's testimony at Green's sentencing showed that Green not only was already awake when he and Hovanec returned from abandoning T.H.'s car, Green also saw them load T.H.'s body into Hovanec's car afterward.  (R. 160: Green Trans., PageID 3327-28).  In other words, Theodorou and Hovanec did not awaken Green and "instruct[]" her to drive them to the burial site as she falsely claimed in the presentence report.  (R. 136: PSR, PageID 3148).  Hence, Green's presentencing attempt to cast herself as completely ignorant about the murder until the last minute significantly misrepresented her knowledge as an accessory-after-the fact.

Indeed, the murder video the court viewed during Hovanec's sentencing showed, as the court recognized, that Green stood close behind Hovanec, (R. 108-1: Sealed Victim Statement, PageID 1713), and "swirl[ed] those three beautiful little girls into her house" after T.H. arrived.  (R. 160: Green Trans., PageID 3472).  As Agent Eilerman testified at Hovanec's sentencing hearing, an audible scuffle occurred by T.H.'s car "[a]lmost immediately" after Green closed the door.  (R. 163: Eilerman, Hovanec Trans., PageID 3530).  That sequence reasonably left the court with "the inescapable conclusion" that Green knew what would "happen in her driveway."  (R. 160: Green Trans., PageID 3472-73).

The evidence also showed that Green's presentence statements misrepresented her alleged "state of shock" that allegedly prevented her from fully

processing learning about the murder.  (R. 135: PSR, PageID 3148).  Instead,

Theodorou testified that before leaving to bury T.H.'s body, Green handed

Hovanec a Ziplock bag with "a powdered substance" to expedite body

decomposition, which Hovanec used and investigators later found on T.H.'s body.

(R. 160: Theodorou, Green Trans., PageID 3328-31; R. 160: Eilerman, Green

Trans., PageID 3400-01).  That testimony, particularly when paired with the

murder video sequence the court noted, readily showed Green's mental clarity,

rather than shock, in later helping conceal T.H.'s murder.  The court therefore had

ample grounds to deny an acceptance reduction.

This Court has affirmed acceptance reduction denials where a defendant

similarly "admitted to certain conduct, but constantly attempted to mischaracterize

that conduct, 'spin' it, so to speak, and minimize his responsibility."  United States

v. Wolfe, 71 F.3d 611, 616 (6th Cir. 1995); accord United States v. Zerpa-Ruiz,

784 F. App'x 353, 357 (6th Cir. 2019) (quoting United States v. Lay, 583 F.3d

436, 449 (6th Cir. 2009)).  This Court has also affirmed the denial of acceptance

where the defendant "falsely denied, or frivolously contested, relevant conduct that

the district court determined to be true."  United States v. Anthony, 24 F. App'x

444, 447 (6th Cir. 2001).  That includes finding no clear error in a district court

considering a defendant's "continued denials of his involvement in" relevant

criminal conduct that preceded and explained the background of his charged

offense.  See, e.g., United States v. Hall, 664 F. App'x 479, 483 (6th Cir. 2016)

(acceptance reduction denied where defendant continued denying his involvement

in a burglary resulting in the theft of a firearm that he illegally possessed).

Accordingly, Green's post-plea dishonesty minimizing her knowledge and

participation as an accessory after-the-fact independently supported the court's

decision denying an acceptance reduction.

Indeed, applying deferential clear-error review to the court's factual findings

about Green's limited and misleading admissions to her offense conduct, Estrada-

Gonzalez, 32 F.4th at 614, it is at the very least "plausible" from Theodorou's

testimony that Green had not been recently awakened when she watched her co-

defendants load T.H.'s body in Hovanec's car and provided Hovanec a

decomposition substance.  While the court did not make those individualized

findings per se, it found that despite Theodorou minimizing his knowledge in

denying knowing what would happen "as of Friday into Sunday," his overall

testimony about what Green knew was credible.  (R. 160: Green Trans., PageID

3446).  The court thus reasonably credited Theodorou about Green's clear

consciousness concerning T.H.'s murder and the concealment efforts.

Even if another factual finding would also have plausibly supported a

different finding about the evidence, this Court still cannot reverse for clear-error if

the district court's factual finding is plausible.  United States v. Vance, 956 F.3d

846, 853 (6th Cir. 2020). Because the district court's evidence-based conclusion "clears this low bar," Estrada-Gonzalez, 32 F.4th at 614, Green cannot dismiss the evidence showing her greater involvement as an accessory-after-the-fact than she claimed, particularly on plain-error review. And this Court may affirm the district court's decision on any supportable ground. United States v. Henderson, 626 F.3d 326, 334 (6th Cir. 2010).

### D.    Green also did not fully accept responsibility by minimizing her knowledge during her plea colloquy.

At the very least, Green's incredible presentence report statements combined with her false plea hearing statements warranted the denial. Indeed, this Court has held that a district court may deny an acceptance reduction where "ample evidence" in the plea transcript and presentence report showed that the defendant "had not accepted responsibility and had instead tried to minimize his role in the conspiracy." United States v. Verduzco, 558 F. App'x 562, 566 (6th Cir. 2014); accord United States v. Sengmany, 590 F. App'x 494, 501 (6th Cir. 2014); Zerpa-Ruiz, 784 F. App'x at 357-58 (noting, in affirming denial of an acceptance reduction, that even without obstructive conduct, defendant "sought to downplay the severity of his conduct throughout the case"); United States v. Nash, 65 F. App'x 546, 548-49 (6th Cir. 2003) (affirming denial of an acceptance reduction where defendant "had not only been deceitful during the plea hearing,

41

but had also continued his deceit at the presentence interview after having had time to reflect").

Here, the district court properly considered Green's plea colloquy claims falsely denying her knowledge about the murder method. Those claims contradicted her prior admissions during a pre-indictment April 28, 2022 interview with FBI Special Agents Kyle Fulmer and Mike Huber, where Green initially denied knowing that Hovanec had a syringe, but eventually acknowledged that Hovanec said she had one. (R. 160: Eilerman: Green Trans., PageID 3394-96; R. 136: PSR, PageID 3146). Theodorou also testified at Green's sentencing hearing that Green was present during pre-murder discussions about how Hovanec would kill T.H. (R. 160: Theodorou, Green Trans., PageID 3311-12). And the video showing Green's conduct before the murder, as the court found, corroborated that Green knew what would occur. (R. 160: Green Trans., PageID 3472).

Yet, after the prosecutor described the elements of Green's accessory-after-the-fact offense at the plea hearing, Green said she was "questioning the 'knowingly.'" (R. 66: Plea Trans., PageID 620). She then claimed, "I don't know what they did." (Id.). Green next admitted knowing "after the fact" that her co-defendants killed T.H., but incredibly claimed "I just don't know how." (Id.). That squarely differed from her pre-indictment admission to FBI agents about the syringe and was inconsistent with fully accepting responsibility.

While Green later admitted during the plea hearing to knowing "[a]fter the fact" that "they did it with some kind of drug that they imported," (id., PageID 627), she never corrected her denied knowledge of "how" her co-defendant's killed T.H.—with a poison-filled syringe. And Green's relevant conduct as an accessory-after-the-fact included "all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant." U.S.S.G. § 3E1.1, Applic. n.10.

This Court has recognized that "[e]ven where a defendant does 'admit substantial elements of the crime[] charged,' a reduction is not appropriate if the defendant contests even one factual element of the offense." United States v. Trevino, 7 F.4th 414, 432 (6th Cir. 2021) (quoting United States v. Coss, 677 F.3d 278, 292 (6th Cir. 2012), and affirming denying an acceptance reduction where defendant went to trial and "contested facts essential to the charges against him"). Thus, a district court may deny an acceptance reduction where, as here, the defendant admits substantial elements of the charged crimes, but denies "the requisite mens rea." Coss, 677 F.3d at 291.

Accordingly, the district court properly considered Green's pre-indictment statements to FBI agents in considering her inconsistent post-indictment denials about her full knowledge. And because Green was "parsing the word 'knowingly' and making a big deal about after the fact at the time of her change of plea,"

(R. 160: Green Trans., PageID 3445-47), and further continued minimizing her knowledge in the presentence report, the court properly denied an acceptance reduction.

**E.    Sentencing courts may consider defendants' pre-indictment admissions to federal investigators in considering whether they have consistently accepted responsibility.**

None of the cases Green cites precluded the court from considering her pre-indictment admissions to FBI agents in determining whether her acceptance was consistent.  This Court favorably noted in a case that Green cites for reversing the denial of acceptance that the defendant there "accepted responsibility for her actions early-on," where before federal charges, the defendant said "she would plead guilty."  United States v. Hakley, 101 F. App'x 122, 127 (6th Cir. 2004).  And it would make little sense for a sentencing court to permissibly consider a defendant's early admissions in granting an acceptance reduction, but not in denying one.  Indeed, Congress explicitly gives district courts broad discretion to consider any matters they find relevant to sentencing under 18 U.S.C. § 3661.

Further, in United States v. Childers, 86 F.3d 562 (6th Cir. 1996), for example, this Court upheld the denial of an acceptance reduction where the defendant confessed to stealing mail when interviewed by postal inspectors before his arrest and indictment, id., and continued engaging in "the same or similar" criminal conduct after he "had an opportunity to voluntarily terminate his criminal

conduct." Id. at 564.  In other words, the defendant's pre-indictment admissions to federal investigators could be considered factually as the starting point for his acceptance and the basis for finding that his subsequent, additional criminal conduct was "inconsistent with his claims of remorse and contrition." Id.

This Court's factually distinguishable decision in United States v. Jeter, 191 F.3d 637 (6th Cir. 1999), supports that view.  Jeter found the "relevant time period for [considering additional state criminal conduct in determining acceptance of responsibility for federal charges there was] ... "the date federal authorities indicted [defendant] and he became aware that he was subject to federal investigation and prosecution." Id. at 641 (emphasis added).  Jeter was arrested and charged for state fraudulent loan transactions, committed new similar conduct before he was federally indicted and pled guilty, and was denied acceptance of responsibility because he continued committing criminal activity after his earlier state charges.

Unlike Childers, defendant Jeter did not commit additional criminal conduct after a pre-federal indictment confession to federal investigators, however.  And Jeter tellingly acknowledged that "[h]ad Jeter confessed to federal authorities prior to the indictment or responded in some way to investigators to indicate his remorse or cessation of criminal activity like the defendant in Childers, the district court would be free to use that conduct to question the sincerity of his later acceptance of

45

responsibility." Jeter, 191 F.3d at 641; see also United States v. Tilford, 224 F.3d 865, 867 (6th Cir. 2000) (noting that "[u]nlike Childers, Tilford did not accept responsibility when the IRS agents first interviewed him" and his subsequent criminal activity therefore did not constitute continuing criminal activity for acceptance purposes). Further, Hakley similarly acknowledged Childers as an anomalous case where the defendant "accepted responsibility" in a pre-indictment confession to federal investigators and thus was not entitled to an acceptance reduction for committing intervening state offenses that were inconsistent with his pre-indictment acceptance. Hakley, 101 F. App'x at 129.

While this case does not involve continuing criminal conduct after a pre-indictment confession, at the very least, Childers, Jeter, and Hakely support the conclusion that a district court may permissibly consider a defendant's pre-indictment confession to federal investigators in gauging her post-indictment statements' consistency for acceptance purposes. Here, Green's pre-indictment admissions to federal agents during their investigation into T.H.'s whereabouts present similar circumstances to Childers, which triggered an earlier acceptance period than Jeter. Indeed, unlike Jeter, Green was on notice she was subject to a federal investigation and potential prosecution when she made the pre-indictment syringe admission to two FBI agents who interviewed her about T.H., a missing State Department employee whose work concerned national security issues. See

generally, (R. 160: Eilerman, Green Trans., PageID 3392-96; R. 163: Eilerman, Hovanec Trans., PageID 3522; R. 163: Stuart's Victim Statement, Hovanec Trans., PageID 3680-83). Jeter's conclusion that he did not commit criminal "conduct that impeache[d] defendant's acceptance of responsibility" after his later, post-indictment acceptance consideration period began, id., therefore has no bearing on Green's pre-indictment admissions to federal investigators that triggered an earlier acceptance consideration timeline. Accordingly, even if Green's post-indictment wavering about her prior admitted knowledge that Hovanec had a syringe could logically be equated with caselaw on continuing criminal conduct, Green's inconsistent statements with her pre-indictment admissions to federal investigators fell within the limited circumstances that Jeter and similar cases said a district court could consider in evaluating acceptance.

And the testimony about Green's admissions by the case agent who was familiar with, but not present during, those interviews, did not undercut their evidentiary value. (R. 160: Eilerman, Green Trans., PageID 3391-92). A sentencing court "can consider information so long as it has some evidentiary basis and a minimal indicium of reliability." United States v. Whitlow, 134 F.4th 914, 927 (6th Cir. 2025) (cleaned up). That "requirement is a relatively low hurdle," and this Court's "highly deferential" review limits reversal on a "reliability finding only if it was clearly erroneous." Id. Here, the prosecution easily satisfied that

47

"low hurdle" for showing reliability by playing the interviews themselves for the court's consideration.  (R. 160: Eilerman, Green Trans., PageID 3390-96).  The court, having then had the opportunity to observe Green and review the recordings, properly found her efforts to minimize her conduct were not credible.

Green, in sum, did not simply fail to volunteer or affirmatively admit relevant conduct, she intentionally and carefully crafted significant factual misrepresentations about her conduct and role surrounding T.H.'s death in post-confession plea hearing and presentence report statements.  Because Green has not shown she was entitled to an acceptance reduction on those facts, this Court should affirm the district court's decision denying her the reduction.

## II.  THE DISTRICT COURT CORRECTLY ORDERED GREEN TO PAY RESTITUTION FOR THE MINOR VICTIMS' PSYCHOLOGICAL CARE.

### A.  Standard of review.

This Court reviews a restitution order's propriety de novo.  United States v. Church, 731 F.3d 530, 535 (6th Cir. 2013).

### B.  Restitution for offenses resulting in bodily injury to a victim.

Restitution is a part of a criminal defendant's sentence.  United States v. Winans, 748 F.3d 268, 271 (6th Cir. 2014).  "[F]ederal courts have no inherent power to award restitution," however.  Church, 731 F.3d at 535 (cleaned up).

Thus, "restitution orders are proper only when and to the extent authorized by statute." Id. (cleaned up).

Restitution for violations of Title 18, United States Code, as here, is discretionary under 18 U.S.C. § 3663. And the district court has "wide latitude" to determine each victim's losses. United States v. Patel, 711 F. App'x 283, 287 (6th Cir. 2017).

A defendant is liable for restitution to any "person 'directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered.'" United States v. Sosebee, 419 F.3d 451, 458 (6th Cir. 2005) (quoting 18 U.S.C. § 3663(a)(2)). That includes paying restitution to the "representative of the victim's estate," "if the victim is deceased." 18 U.S.C. § 3663(a)(1)(A); see also id. § 3663(a)(2).

And a person may qualify as a victim even though she may not have been the target of the crime, if she suffers harm from the crime's commission. In re McNulty, 597 F.3d 344, 351 (6th Cir. 2010). In making that determination, a sentencing court must: (1) first look at the offense of conviction, based solely on the facts reflected in the jury verdict or admitted by the defendant; and (2) determine, based on those facts, whether any person or persons were "directly and proximately harmed as a result of the commission of that federal offense,"

using "traditional but for and proximate cause analyses." <u>Id.</u> at 350-51 (cleaned up).

Relevant here, the court may require a defendant to pay a victim restitution for offenses resulting in bodily injury.  18 U.S.C. § 3663(b)(2).  That includes ordering the defendant to "(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment...." 18 U.S.C. § 3663(b)(2)(A).

As discussed below, the term "bodily injury" includes psychological injury. And Green among other things not only physically injured T.H. by providing a decomposition substance, but caused the minor victims—T.H.'s children and her granddaughters—to suffer bodily injury with physical and psychological manifestations, which satisfied Section 3663(b)(2)'s requirements for restitution.

**C.    Section 3663(b)(2)(A)'s "bodily injury" provision includes psychological harm the defendant caused a victim.**

The district court correctly adopted the Seventh and Tenth Circuits' holdings, both on plain-error review, that Section 3663(b)(2)(A)'s restitution provision in "bodily injury" cases encompasses, as here, a victim's psychological injury.  (R. 161: Order, PageID 3486-87) (citing <u>United States v. Breshers,</u> 684 F.3d 699, 702-03 (7th Cir. 2012); <u>United States v. Dotson,</u> No. 99-6736, 2000 WL 1820375, *5 (10th Cir. 2000)).  While Section 3663(b)(2) does not explicitly

say "bodily injury" means psychological injury, <u>Dotson</u> recognized that subsection 3663(b)(2)(A), which immediately follows Section 3663(b)(2), "enumerates 'physical, psychiatric, and psychological care' separately, indicating that perhaps 'bodily injury' is a holistic phrase referring to all aspects of the body, physical and psychological." <u>Dotson</u>, 2000 WL 1820375, at *5.  Section 3663(b)(2) thus functionally defines "bodily injury" as psychological injury in subsection 3663(b)(2)(A).

That makes consulting a dictionary's "bodily injury" definition unnecessary to determine subsection 3663(b)(2)(A)'s meaning since this Court starts with the statute's language itself.  <u>United States v. Plavcak</u>, 411 F.3d 655, 660 (6th Cir. 2005).  This Court assumes the language's "ordinary meaning" "accurately expresses the legislative purpose." <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194 (1985).  And this Court does not read the text "in isolation but rather in context." <u>In re MCP No. 185</u>, 124 F.4th 993, 1001 (6th Cir. 2025) (cleaned up).  Indeed, a word's "context determines meaning" within a statute. <u>Johnson v. United States</u>, 559 U.S. 133, 139 (2010).

Accordingly, because Section 3663(b)(2)'s context shows that "bodily injury" encompasses psychological harm under subsection 3663(b)(2)(A)'s language that ends the inquiry.  <u>See</u> <u>United States v. Douglas</u>, 634 F.3d 852, 858 (6th Cir. 2011) (a statute's language "is the starting point for interpretation, and it

should also be the ending point if the plain meaning of that language is clear"
(cleaned up)).

     While Green nevertheless incorrectly resorts to dictionary definitions of
"bodily injury" in arguing that term only encompasses physical harm to a victim's
body, courts "do not force term-of-art definitions into contexts where they plainly
do not fit and produce nonsense." Johnson, 559 U.S. at 139 (cleaned up).  And
applying that narrow physical-harm-only definition would conflict with other
"[f]ederal [criminal] law [that] deems mental injury to constitute bodily injury in
other contexts." Dotson, 2000 WL 1820375, at *5; see also 18 U.S.C.
§ 1365(h)(4)(D) (tampering with products statute defining "bodily injury" to mean
in relevant part "impairment of the function of a bodily member, organ, or mental
faculty"); 18 U.S.C. § 1864(d)(2)(D) (same—hazardous or injurious devices on
federal lands); cf. 18 U.S.C. § 2118(e)(3) (same—"significant bodily injury" in
robberies and burglaries involving controlled substances); 18 U.S.C. § 831
(same—"bodily injury" and "serious bodily injury" in prohibited transactions
involving nuclear materials).  That several criminal statutes include mental injury
as bodily injury therefore further supports that Section 3663(b)(2)'s "bodily injury"
restitution provision includes psychological harm and associated care.

     Green's argument that Congress could have included the above statutes'
express "bodily injury" definition in Section 3663(b)(2) misses that using the

words "psychiatric" and "psychological" in the next subsection served that same definitional function. Accordingly, Section 3663(b)(2)'s language as whole undercuts Green's claim that only victims who personally suffer bodily injury vis-à-vis physical harm qualify for restitution based on additional psychological injury.

The cases Green cites do not demonstrate otherwise. The Eighth and Ninth Circuits in United States v. Reichow, 416 F.3d 802, 805 (8th Cir. 2005), and United States v. Hicks, 997 F.2d 594, 601 (9th Cir. 1993) (Victim Witness Protection Act "VWPA"), and the district court in United States v. Rivera-Solis, 733 F. Supp. 3d 46, 55 (D.P.R. 2024), all mistakenly assumed Section 3663(b)(2)(A) excluded psychological care without physical injury. But those decisions failed to consider the import of subsection 3663(b)(2)(A)'s specific inclusion of psychiatric and psychological care for definitional purposes.

Additionally, Rivera-Solis cited United States v. Yellow Hawk, No. CR 17-50090-01-JLV, 2020 WL 4284369, *3 (W.D.S.D. Jul. 27, 2020), which incorrectly intermingled two subsections in denying restitution for psychological care and lost income for a murder victim's wife, without separately analyzing Section 3663(b)(2)(A)'s language. Rivera-Solis, 733 F. Supp. 3d at 54. Rivera-Solis also mistakenly relied on United States v. Wilcox, 487 F.3d 1163, 1176 (8th Cir. 2007), which precluded restitution under a distinguishable lost-income subsection that is not at issue here. Rivera-Solis, 733 F. Supp. 3d at 54.

The lost-income provision indicates that the victim who suffered bodily injury and lost wages must be the same person referenced in Section 3663(b)(2)'s bodily injury clause by permitting restitution to "reimburse the victim for income lost by such victim as a result of such offense." 18 U.S.C. § 3663(b)(2)(C); see also United States v. Dayea, 73 F.3d 229, 231 (9th Cir. 1995). By contrast, subsection 3663(b)(2)(A) omits subsection 3663(b)(2)(C)'s specific "the victim" and "such victim" language. And without that limitation, subsection 3663(b)(2)(A) permits restitution for any victims of the same bodily-injury offense who suffered different forms of harm.

Green's reliance on United States v. Patton, 651 F. App'x 426, 426-27 (6th Cir. 2016), which also cited Wilcox is misplaced for similar reasons. Patton held that 18 U.S.C. § 3663A(b)(2)(C)'s lost-income provision, which is identical to subsection 3663(b)(2)(C), "forecloses lost-wages reimbursement for family members who suffered no bodily injury." Id. While that view comports with other lost-income restitution cases, it does not apply to psychological-care restitution under differing subsection 3663(b)(2)(A) here.

The Ninth Circuit, for example, denied lost-income restitution to a surviving spouse of an involuntary manslaughter victim, under the predecessor VWPA framework, where she "did not suffer bodily injury from [defendant's] involuntary manslaughter of her husband." Dayea, 73 F.3d at 232. And the Fourth Circuit

found coal mining bombing victims ineligible for lost income restitution under the VWPA, because they did not suffer bodily injuries.  United States v. Sharp, 927 F.2d 170, 174 (4th Cir. 1991).  Given that Fourth Circuit holding, the government, in conceding error concerning a restitution order for psychological counseling in United States v. Powell, 42 F. App'x 565 (4th Cir. 2002), may have believed it was bound by Sharp.  But Sharp and the other same-victim requirement lost-income cases simply are not instructive for psychological-care restitution under a differently worded subsection.  Thus, the district court correctly concluded that subsection 3663(b)(2)(A) encompassed psychological care.

### D.    Green nevertheless caused T.H.'s daughters to suffer bodily injury—including physical harm—thus entitling them to restitution under Section 3663(b)(2)(A).

Even if Section 3663(b)(2) were limited to bodily injury stemming from physical harm, the minor victims still qualified for psychological-care restitution because, as their paternal grandmother, A.S. stated, they suffered physical manifestations from their psychological injuries.  (R. 163: Hovanec Trans., PageID 3672; R. 108-1: Sealed Victim Impact Statement, PageID 1725).  A.S. said the girls told her that Green "was waiting out there" with "new toys for them and []" snatched them in," when T.H. dropped them off before his murder.  (R. 160: Green Trans., PageID 3454).  Green then further betrayed her granddaughters by leaving them alone to transport Hovanec, Theodorou, and T.H. to T.H.'s burial site.  (Id.).

55

T.H.'s minor children were directly and proximately harmed by experiencing psychological trauma from their mother murdering their father, knowing their grandmother, Green participated in the cover-up.  See (R. 108-1: Sealed Victim Statement, PageID 1720).  Unfortunately, the minor victims also suffered bodily injury—physical manifestations—from that trauma.  At Hovanec's sentencing, A.S., who also spoke at Green's subsequent hearing, (id., PageID 3448-56), explained that T.H.'s young daughters blamed themselves, believing they were somehow responsible for their father's death.  (R. 163: Hovanec Trans., PageID 3672).  She also explained that T.H.'s daughters drew "many sad pictures" and suffered from nightmares.  (Id., PageID 3671-72; see also R. 108-1: Sealed Victim Statement, PageID 1725).

Investigators uncovered an example of those pictures at Green's residence, when they found a child's drawing of a circled stick figure in the center with "a purple color" coming from "the eyes," "mouth," and "stomach," a tombstone with the words "RIP" above, and "stupid daddy" and "I hate daddy" next to the stick person.  (R. 163: Little, Hovanec Trans., PageID 3625-26).  "[A] ghost [appeared to be] coming" from the person with the words, "angel's spirit," along with a red figure below labeled, "demon soul."  (Id.).  A female figure appeared to the right with the caption, "amazing mommy" and "hate stupid daddy."  (Id.).  To the lower

left of the center figure, there appeared to be a deceased person with "X's over the eyes" and the words, "die, daddy."  (Id.).

Beyond suffering such significant emotional trauma, the children experienced "physical reactions."  (Id., PageID 3671-72).  A.S. outlined those physical manifestations in her sealed statement for Green's sentencing, noting that the children had abdominal pain, headaches, and exacerbated medical conditions. (R. 108-1: Sealed Victim Statement, PageID 1725).  These unfortunate facts were sufficient to support the court's order for Green to pay restitution for causing T.H.'s daughters' psychological injuries under Section 3663(b)(2)(A).

Indeed, in the context of a civil intentional infliction of emotional distress case, this Court recognized that bodily injury may result from emotional distress. Armstrong v. Shirvell, 596 F. App'x 433, 455 (6th Cir. 2015).  Here, the minor victims experienced bodily injuries from psychological harm that Green caused, which were sufficient to warrant restitution even if not part of the district court's specific findings in ordering restitution.  Indeed, this Court may affirm a district court's decision on any supportable ground.  Henderson, 626 F.3d at 334.

### E.   Section 3663(b)(2)(A) does not require "a victim" who suffered bodily injury to be the same victim receiving psychological care.

Even if physical manifestations from their psychological injuries were insufficient to qualify as bodily injury, Green still caused physical injury to T.H., by providing a decomposition substance that Hovanec poured on T.H.'s body

before burial.  (R. 160: Theodorou, Green Trans., PageID 3330; R. 160: Eilerman, Green Trans., PageID 3400-01).  In doing so, Green arguably helped commit gross abuse of T.H.'s corpse, which Hovanec and Theodorou tried to conceal by burying T.H. at a remote location.  <u>See</u> Ohio Rev. Code § 2927.01(B); <u>State v. Nobles</u>, 665 N.E.2d 1137, 1150 (Ohio App. Ct. 1995) ("gross abuse of a corpse can apparently be found in any attempt to conceal a body" (collecting cases)).  That satisfied any threshold physical injury requirement under subsection 3663(b)(2)(A).

Further, unlike Section 3663(b)(2)(C)'s lost-income provision, Section 3663(b)(2) does not specify that "a victim" who suffered bodily injury must be the same victim receiving psychological care under subsection 3663(b)(2)(A) for restitution purposes.  Thus, there was no error in the district court's restitution order.  And this Court should affirm it.

## III.   THE DISTRICT COURT DID NOT COMMIT PLAIN PROCEDURAL ERROR IN CONSIDERING HOVANEC'S MITIGATING FACTORS.

### A.   Standard of review.

This Court reviews the reasonableness of a criminal sentence under a deferential abuse-of-discretion standard.  <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007).  This reasonableness analysis "has both a procedural and a substantive component."  <u>United States v. Gunter</u>, 620 F.3d 642, 645 (6th Cir. 2010).

A district court "commit[s] [a] significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Gall, 552 U.S. at 51.  As discussed concerning Green's claims, the deferential clear-error standard that applies to factual determinations requires this Court "to defer to the district court's finding about what transpired 'even if [it] would have made the opposite finding,' so long as both stories are plausible on the record as a whole." Estrada-Gonzalez, 32 F.4th at 614 (quoting Caston, 851 F. App'x at 560).  So "whenever conflicting evidence permits a district court to make two 'permissible' findings, an appellate court must respect its choice of one finding over the other." Caston, 851 F. App'x at 560 (cleaned up); see also ; see also Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).

Further, to preserve a procedural reasonableness challenge on appeal, a defendant must object in the district court.  United States v. Vonner, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc).  When a party receives an opportunity to raise new objections to a sentence after it is imposed, but fails to do so, plain-error review applies to the procedural reasonableness inquiry for all issues not previously raised.  United States v. Bostic, 371 F.3d 865, 872-73 (6th Cir. 2004).

Under this standard, a defendant must demonstrate "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." Vonner, 516 F.3d at 386 (cleaned up).

Here, after imposing sentence, the district court asked if defense counsel had "any procedural or substantive objections," in noting that Hovanec preserved the "right to argue about the two enhancements." (R. 163: Hovanec Trans., PageID 3714). Defense counsel confirmed that was "Correct" and that he had no other objections. (Id.). Since Hovanec did not object on grounds that the court "mischaracterized" the psychological evaluation as she now argues here, plain-error review applies to her procedural reasonableness claim on that ground.

A finding of plain error is warranted only in "exceptional circumstances," "where the error is so plain that the trial judge ... [was] derelict in countenancing it." Vonner, 516 F.3d at 386 (cleaned up). That did not occur here.

### B.    The district court properly found that Hovanec's family background in the psychological report was unsubstantiated.

The district court properly considered the psychological report discussing Hovanec's background in mitigation, finding it "hard" "not to fathom that there were at least a few missing pieces in Ms. Hovanec's life" that emerged "to get her to where she was" in committing her offenses, but overall it tended "to agree more than [] disagree" with the prosecutor's view about the report. (R. 163: Hovanec

60

Trans., PageID 3706).  As the government noted, the psychological report mostly relied on unsubstantiated "self-reporting" by Hovanec, (id., PageID 3698), since the single police account of her father backhanding a sibling for calling him "a mother f\*\*er" did not involve Hovanec.  (Id., PageID 3700).  That was a logical assessment of the psychological report's statements about Hovanec's self-reported "extensive history of abuse, abandonment, and mental health problems from childhood into adulthood."  (Doc. 24: Hovanec's Br., Page 33).

Two of Hovanec's five sisters claimed "the only way the gross physical violence in the home was moderated" was "when the police were called regarding a parental physical dispute, and the embarrassment of anyone knowing about the sickness of their home life settled down acting out their boiling pot of rage and impulsivity."  (R. 128-2: Hovanec's Sentencing Memorandum, Psychological Evaluation, PageID 2557 (emphasis added)).  But their account of police being called repeatedly cannot be squared with a record check for Green's residence showing a single police report about Hovanec's father slapping a different sister "across the mouth" in January 2001.  (R. 163: Little, Hovanec Trans., PageID 3623-24).

Even though the psychologist who prepared the report accepted two Hovanec sisters' telephone accounts as corroborating Hovanec's childhood abuse claims, (R. 128-2: Hovanec's Sentencing Memorandum, Psychological Evaluation,

61

PageID 2554-59, 2569), the district court was not required to do so.  The court was entitled to discount it given the factual inconsistency with an officer's in-court testimony about the single existing police report involving a different sister.  It also constituted a fact the psychologist may not have considered in preparing her report.  The court, in accepting the government's view about unsubstantiated abuse, thus properly questioned the scope of purported extreme home violence and resulting trauma that Hovanec reportedly suffered growing up.  Further, even "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson, 470 U.S. at 573.

And because, as the government argued, the psychologist also did not note conducting any "independent, objective, or reliable testing," including Hovanec's "intelligence" or "functioning" levels, whether she was "malingering" or "truly suffers from autism," (R. 163: Hovanec Trans., PageID 3698), it was permissible for the court to view her opinion more as a hired advocate by simply accepting Hovanec's self-reported history.  (Id., PageID 3706); cf. Gay v. Parsons, 61 F.4th 1088, 1093 (9th Cir. 2023) (noting that "[t]he psychologists reviewed Gay's files, interviewed him, and looked to a multifactor risk instrument to reach a risk level recommendation.").  That sets the court's findings far apart from non-evidence based reasons for discounting a doctor's findings for being "submitted as an

advocate" in <u>Farris v. Barnhart</u>, 147 F. App'x 638, 640 (9th Cir. 2005), and

<u>Sorensen v. Barnhart</u>, 69 F. App'x 864, 865 (9th Cir. 2003), for example.

Accordingly, nothing about the court's evidence-based conclusions were

clearly erroneous, particularly on plain error-review.  Moreover, Hovanec's

disagreement with how much weight the court gave the report in mitigation goes to

substantive reasonableness, and as discussed below she fails to demonstrate that

her below-Guidelines sentence was unreasonable.

## IV.    THE DISTRICT COURT CORRECTLY APPLIED A TWO-LEVEL ENHANCEMENT FOR HOVANEC'S AGGRAVATING ROLE.

### A.    Standard of review.

This Court reviews the district court's "legal conclusion that a person is an

organizer or leader ... deferentially, and its factual findings for clear error."

<u>United States v. Sexton</u>, 894 F.3d 787, 794 (6th Cir. 2018) (cleaned up).  This

deferential review of the district court's ultimate legal conclusion is based on the

trial judge being "most familiar with the facts" and thus "best situated to determine

whether someone is or is not a 'leader' of a conspiracy."  <u>United States v.</u>

<u>Nicolescu</u>, 17 F.4th 706, 725 (6th Cir. 2021) (cleaned up).

### B.    Factors demonstrating a defendant's aggravating role.

The district court correctly applied a two-level aggravating role

enhancement under U.S.S.G. § 3B1.1(c) because Hovanec was the leader in the

murder and concealment scheme. Section 3B1.1 provides a range of offense-level

increases based on different levels of leadership, including:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. To qualify for any aggravating role enhancement, the defendant

"'must have been the organizer, leader, manager, or supervisor of one or more

other participants.'" Sexton, 894 F.3d at 795 (quoting U.S.S.G. § 3B1.1, Applic.

n.2). And conspiracies can have more than one organizer or leader. Id.

To distinguish among the various levels of aggravating roles, courts consider

several factors, including those from the following nonexhaustive list:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. at 794 (quoting U.S.S.G. § 3B1.1 Applic. n.4).  As this Court has recognized,

"many of these factors emphasize control over others in the criminal activity."

United States v. Salyers, 592 F. App'x 483, 485 (6th Cir. 2015).

The government must "establish the existence of a factor supporting a

sentencing enhancement by a preponderance of the evidence."  United States v.

Aleo, 681 F.3d 290, 298 (6th Cir. 2012).  But district courts "need not find each

factor" for an enhancement to apply.  Sexton, 894 F.3d at 794 (cleaned up).

Rather, a defendant qualifies for a Section 3B1.1 enhancement if a sentencing

court finds she "exercised decisionmaking authority, recruited accomplices,

received a larger share of the profits, was instrumental in the planning phase of the

criminal venture, or exercised control or authority over at least one accomplice."

United States v. Vasquez, 560 F.3d 461, 473 (6th Cir. 2009).

### C.    The evidence showed that Hovanec was a leader in the murder and its concealment.

The evidence readily demonstrated Hovanec's leadership role.  As the court

recognized, she recruited accomplices—Theodorou and Green—and stood to

receive a larger share of profits from the murder scheme.  (R. 163: Hovanec Trans.,

PageID 3653).  Hovanec asked Theodorou if he knew anyone who could kill her

husband.  (R. 163: Eilerman, Hovanec Trans., PageID 3549, 3594).  When

Theodorou ultimately found someone to supply a lethal drug, Hovanec directed

him to ship it to her with concealment instructions to evade the liquid shipping

prohibition. (Id., PageID 3552). And Hovanec and Theodorou's text messages appeared to discuss the hitman, the poison, and where T.H. lived. (Id., PageID 3557-62). The evidence that Theodorou hired the hitman and shipped the drug at Hovanec's direction therefore supported the enhancement.

As the court also found, Hovanec stood to benefit financially and "by getting her children." (Id., PageID 3653). Indeed, text messages confirmed that Hovanec wanted to have a life with Theodorou and T.H. stood in the way of her relocating with the children outside the United States. See generally, (R. 163: Eilerman, Hovanec Trans., PageID 3572-74). The court thus properly found that Hovanec "exercised some emotional control over Theodorou" by manipulating him, which also warranted the enhancement. (R. 163: Hovanec Trans., PageID 3654).

Theodorou's hitman arrangements in South Africa, while Hovanec was living in the United States, does not undercut the court's decision since text messages showed that Theodorou acted at Hovanec's request. See, e.g., (R. 163: Eilerman, Hovanec Trans., PageID 3557-60). And Hovanec herself travelled to South Africa to meet with the third hitman. (Id., PageID 3602).

Hovanec also recruited Green to assist after the murder, and admittedly "made them [Theodorou and Green] all do it." (R. 135: PSR, PageID 3105-06). That included making Theodorou dig the hole for T.H.'s grave. (R. 163: Eilerman, Hovanec Trans., PageID 3621). Hovanec's demonstrated leadership in concealing

the crime thus further supported the two-level enhancement.  Indeed, in a fraud scheme context, for instance, this Court has upheld a leadership enhancement where a defendant created the scheme and computer virus, recruited others, and directed their conduct.  Nicolescu, 17 F.4th at 725.

While Hovanec claims her attempts to minimize her co-defendants' roles were not credible and should have been disregarded given her psychological profile, at bottom those statements corroborated her earlier text messages indicating that the murder scheme stemmed from Hovanec herself.  And nothing in the report suggested that the psychologist considered those messages or other evidence such as the murder video, nor conducted independent reliable testing, (R. 163: Hovanec Trans., PageID 3698-99), in reaching her conclusion about Hovanec's purported "limited decision-making."  (R. 128-2: Hovanec's Sentencing Memorandum, Psychological Evaluation, PageID 2571).  The court therefore did not clearly err in concluding from the evidence that Hovanec had a leadership role.

Whether Theodorou also played a significant role does not undercut that conclusion.  Sexton, 894 F.3d at 795 (recognizing that conspiracies can have more than one organizer or leader).  Accordingly, given the evidence, and affording the required deference to the district court's assessment, the court properly applied a two-level enhancement for Hovanec's aggravating role as a leader in the murder and its concealment.  This Court should affirm that decision.

## V.    THE DISTRICT COURT PROPERLY APPLIED A TWO-LEVEL ENHANCEMENT FOR HOVANEC OBSTRUCTING THE INVESTIGATION.

### A.    Standard of review.

This Court has "sent mixed messages about the standard for reviewing a district court's application of the obstruction-of-justice enhancement." United States v. Histed, 93 F.4th 948, 960 (6th Cir.), cert. denied, 144 S. Ct. 2618 (2024) (cleaned up).  While this Court "review[s] legal conclusions de novo and factual findings for clear error, ... [this Court has] not settled on what deference we give the district court's application of [U.S.S.G.] § 3C1.1 to the facts."  Id. at 960. But like Histed, this Court need not "resolve that conflict here because [Hovanec's] challenge fails under any standard."  Id.  And two of her arguments—an incorrect case reference during the court's findings and predetermining the enhancement's application fall under the more demanding plain-error standard since Hovanec did not object in the district court on those specific grounds.  (R. 163: Hovanec Trans., PageID 3714); Bostic, 371 F.3d at 872-73.

### B.    The Guidelines' criteria for an obstruction enhancement.

A Sentencing Guidelines enhancement for obstructing justice applies where: "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct

related to (A) the defendant's offense of conviction...." U.S.S.G. § 3C1.1. The

government bears the burden of proving the enhancement applies by a

preponderance of the evidence. United States v. Dunham, 295 F.3d 605, 609

(6th Cir. 2002).

> Obstructive conduct that warrants a sentencing enhancement includes:
>
>> destroying or concealing or directing or procuring
>> another person to destroy or conceal evidence that is
>> material to an official investigation or judicial proceeding
>> (e.g., shredding a document or destroying ledgers upon
>> learning that an official investigation has commenced or
>> is about to commence), or attempting to do so.

U.S.S.G. § 3C1.1, Applic. n.4(D). "Obstruction includes any willful action that

blocks, makes difficult, or hinders.'" Histed, 93 F.4th at 960 (cleaned up). "The

obstruction must also be material in that it would tend to influence the

investigation's outcome if the investigator believed the obstructive statements."

Id. And as the Guidelines make clear, a defendant's attempt to obstruct or impede

an investigation is sufficient for the enhancement. U.S.S.G. § 3C1.1 and Applic.

n.4(D).

### C. Hovanec obstructed justice by attempting to impede a missing person investigation.

The district court properly applied an obstruction of justice enhancement for

Hovanec's attempts to thwart the missing person investigation. After murdering

T.H., Hovanec drove T.H.'s car to Dayton, wiped down the car, and removed and

discarded the car's license plate before abandoning it, along with his phone. (R. 163: Eilerman, Hovanec Trans., PageID 3565; R. 163: Little, Hovanec Trans., PageID 3620, 3634).  Hovanec therefore altered and destroyed evidence that would have suggested that T.H. never left her driveway alive that night.

Then Hovanec took T.H.'s body to a heavily wooded area near her home, poured a substance on T.H.'s body to hasten decomposition, and buried him. (R. 163: Little, Hovanec Trans., PageID 3621).  Hovanec thus not only attempted to conceal T.H.'s body, but to destroy it with the decomposition substance.

Next, Hovanec created a false narrative to tell investigators who were trying to locate T.H., claiming that T.H. possibly went to Columbus or Dayton, where he reportedly had skydiving friends.  (Id., PageID 3611).  Since Hovanec already abandoned T.H.'s car and phone in Dayton, her calculated claim provided a seemingly plausible, alternative reason for T.H.'s absence and his car being in Dayton if investigators were to locate his car there, which they later did through historical location information for his phone.  (R. 163: Eilerman, Hovanec Trans., PageID 3526-28).  Hovanec's deceitful explanation therefore was material because it could have influenced the investigation outcome if investigators believed T.H. intentionally drove from Green's home to Dayton and further inferred from his car's presence in a rough neighborhood that he possibly was carjacked.  (R. 163: Hovanec Trans., PageID 3654).  Hovanec's "lying to police about an ongoing

investigation" by supplying false explanations for T.H.'s location therefore obstructed justice.  Histed, 93 F.4th at 960-61.

Moreover, to feign and bolster her purported ignorance about T.H.'s disappearance after her first interview with investigators, Hovanec sent T.H. a text message expressing concern about his whereabouts.  (R. 163: Little, Hovanec Trans., PageID 3616; R. 129-5: Sealed Gov't Sentencing Memorandum (Hovanec), Interview, PageID 2772-73).  Since she did so knowing he was dead and buried near her home, Hovanec's materially false statements sought to further thwart the missing person investigation.

Indeed, Hovanec's text message to her deceased husband resembled creating a false document during the investigation since she knew the value of data that investigators could glean from phones and consciously sought to avoid "leav[ing] a digital footprint of their actions."  (R. 163: Eilerman, Hovanec Trans., PageID 3542; see also id., PageID 3542, 3555).  The court thus properly found Hovanec's "clear, affirmative act" of sending that message "to a dead man's cell phone" after talking to investigators constituted an attempt to "throw them off the scent" and obstruct the investigation.  (R. 163: Hovanec Trans., PageID 3645).  And absent the incriminating video, which Hovanec did not learn about until after telling those lies, Hovanec had a good chance of getting away with the murder.

71

That Hovanec's false statement to investigators only caused a 12-hour investigation delay, as she notes, (Doc. 24: Hovanec's Br., Page 47), is immaterial. A defendant's failed endeavor to impede an investigation "does not matter" because "the Guidelines consider the "attempt to obstruct or impede an investigation to be just as serious as successfully doing so." Histed, 93 F.4th at 960 (quoting U.S.S.G. § 3C1.1).

And while an obstruction of justice enhancement does not apply where an investigation is almost complete and investigators already know the defendant is lying, United States v. Williams, 952 F.2d 1504, 1515 (6th Cir. 1991), here the court correctly applied the enhancement because Hovanec lied and committed acts to impede the investigation when investigators did not yet know T.H.'s well-being or whereabouts. That was sufficient to justify the enhancement.

Contrary to Hovanec's argument, the court's mistaken citation to an aggravating role case, United States v. Minter, 80 F.4th 753 (6th Cir. 2023), when applying the obstruction enhancement does not demonstrate the court committed reversible plain error. The court correctly relied on Minter when applying the aggravating role enhancement earlier. See (R. 163: Hovanec Trans., PageID 3653). And while it later found the government "established, for several of the reasons under Minter, the enhancement for obstruction," the court's next comment mentioned its aggravating role findings, explaining that it would "apply both of

those"—the aggravating role and obstruction enhancements. (<u>Id.</u>, PageID 3655). The full context therefore shows the court simply misspoke when summarizing its obstruction and earlier aggravating role findings. That isolated misstatement therefore was harmless and does not satisfy the third and fourth prongs of the plain-error test.

As discussed, the court correctly relied on Hovanec's qualifying obstructive conduct—sending a false text message to impede the investigation—in correctly applying the obstruction enhancement. The passing <u>Minter</u> reference therefore did not affect Hovanec's substantive rights. <u>Cotton</u>, 535 U.S. at 631. And she cannot show that but for that misstatement the outcome would have been different. <u>Molina-Martinez</u>, 578 U.S. at 194. Moreover, this Court may affirm on any supportable ground.

Finally, the court did not commit plain procedural error by purportedly pre-determining an obstruction enhancement applied. While the court said it "really never had any doubt about that one since I've first come onto this case in terms of everything that happened here," (<u>id.</u>, PageID 3654), that comment followed giving the parties an extensive, full and fair opportunity to present arguments about its applicability. (<u>Id.</u>, PageID 3635-36, 3644-47, 3651-53). And the court's findings reflected that it considered and responded to those arguments.

73

In particular, the court agreed with the government's view about the likelihood of Hovanec successfully concealing the murder absent the video, while also taking defense counsel's point about "tracing cell phones."  (Id., PageID 3654).  But even with the cell phone data, the court recognized that investigators "wouldn't have had a body."  (Id.).  And even "[i]f they had a body ... etorphine [was] not something that's routinely tested for in toxicology," making it likely the medical examiner would have concluded T.H. died from "a heart attack." (Id.).  The court thus found Hovanec's attempts to hide evidence and disguise her actions were sufficient to warrant the enhancement.  Because nothing about that reasoning was improper, having fully considered the parties' arguments, this Court should affirm on that supportable ground.  See generally, Henderson, 626 F.3d at 334.

## VI.    THE DISTRICT COURT IMPOSED A SUBSANTIVELY REASONABLE BELOW-GUIDELINES SENTENCE FOR HOVANEC'S PREMEDITATED MURDER OF T.H.

### A.    Standard of review.

If a district court's sentencing decision is procedurally sound, this Court considers a defendant's substantive reasonableness challenge to his sentence under a deferential abuse-of-discretion standard.  Gall, 552 U.S. at 51.  A defendant challenging his sentence as substantively unreasonable is arguing that the sentence was too long, or that the court placed too much weight on particular factors and too

little weight on others.  United States v. Rayyan, 885 F.3d 436, 442 (6th Cir. 2018).

"Sentences within a defendant's Guidelines range are presumptively substantively reasonable, a presumption that naturally extends to sentences below the Guidelines range."  United States v. Pirosko, 787 F.3d 358, 374 (6th Cir. 2015). In fact, criminal defendants "must surmount a high bar to succeed on a substantive-reasonableness challenge even to an upward variance."  United States v. Thomas, 933 F.3d 605, 613 (6th Cir. 2019).  Thus, Hovanec's burden to show that the district court abused its discretion in imposing a below-Guidelines sentence is "even more demanding."  United States v. Curry, 536 F.3d 571, 573 (6th Cir. 2008).

Where "a district court explicitly or implicitly considers and weighs all pertinent factors, a defendant clearly bears a much greater burden in arguing that the court has given an unreasonable amount of weight to any particular one." United States v. Zobel, 696 F.3d 558, 571 (6th Cir. 2012) (cleaned up).  This Court generally "must give 'due deference' to the district court's conclusion that the sentence imposed is warranted by the [18 U.S.C.] § 3553(a) factors." United States v. Bolds, 511 F.3d 568, 581 (6th Cir. 2007).  A district court's weighing of those factors "is a matter of reasoned discretion, not math," and therefore, this Court's review is "highly deferential."  Rayyan, 885 F.3d at 442; see

also United States v. Johnson, 934 F.3d 498, 500, 502 (6th Cir. 2019) ("plenty of deference" required because "[r]easoned judgments about the appropriate length of a sentence are largely for trial courts, not appellate courts").

This Court has stated that its task "is not to pick the sentence that we would prefer (whether higher or lower), but only to ensure that the sentence chosen by the district court fell within its broad range of reasoned discretion." United States v. Lynde, 926 F.3d 275, 283 (6th Cir. 2019).  Thus, that "the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall, 552 U.S. at 51.

### B.    Hovanec's below-Guidelines sentence for committing premeditated murder was substantively reasonable.

Hovanec's below-Guidelines, 480-month sentence for committing premeditated murder was substantively reasonable based on the district court's reasoned, discretionary application of the Section 3553(a) factors.  Hovanec fails to show that the district court imposed her sentence arbitrarily, or that its overall length was unreasonable.

The court found it difficult to fathom a more premeditated, carefully executed murder than the one Hovanec committed.  (Id., PageID 3705).  That made it "tough" for the court to reconcile what Hovanec did to her three children, where she murdered their father in "cold blood."  (Id.).  While the court agreed something was missing in Hovanec's life, which emerged when she committed the offense, it

overall agreed with the government's view about shortcomings in the psychologist's report, (id., PageID 3706), and the need for the sentence to reflect that it was "not okay to solve a legal problem and a domestic dispute with murder." (Id., PageID 3708). The court therefore permissibly found that those combined factors warranted a below-Guidelines, 480-month sentence.

While the court found that Hovanec's mitigating factors warranted a downward variance, the egregious facts readily would have supported a Guidelines life imprisonment sentence. Hovanec's disagreement with the court's balancing in this case—and in particular, the "shaker of salt" weight it gave the defense's psychologist's report, (id., PageID 3706)—is beyond the scope of this Court's review. Sexton, 512 F.3d at 332; Ely, 468 F.3d at 404. And the record readily supported that assessment as within the court's wide discretionary scope where, as discussed above, the report lacked any indication of independent, objective reliable testing to confirm Hovanec's self-reported history and Hovanec's two (of five) sisters' accounts conflicted with an objective record check showing a single police report involving a different sister. (R. 163: Little, Hovanec Trans., PageID 3623-24).

At bottom, Hovanec simply has not shown her 480-month sentence was unreasonable where the court's cited reasons logically supported the sentence that it chose. United States v. Jackson, 466 F.3d 537, 540 (6th Cir. 2006) ("the fact that

the district court did not give the defendant the exact sentence he sought is not a cognizable basis to appeal...."). This Court therefore should defer to the district court's decision and affirm Hovanec's below-Guidelines sentence as substantively (and procedurally) reasonable.

## <u>**CONCLUSION**</u>

For the foregoing reasons, the United States respectfully requests that this

Court affirm Green and Hovanec's sentences.

Respectfully submitted,

CAROL M. SKUTNIK
Acting United States Attorney

By:  <u>/s/ Laura McMullen Ford</u>
Laura McMullen Ford
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone No: (216) 622-3817
Facsimile No: (216) 522-8355
<u>Laura.Ford@usdoj.gov</u>

## **<u>CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION</u>**

I hereby certify that the foregoing contains 16,909 words according to the word-counting feature of Microsoft Word for Office 365 and complies with this Court's order dated June 30, 2025, granting the government permission to exceed the word limitation for a total of 18,000 words.  (Doc. 31: Order).

/s/ Laura McMullen Ford
Laura McMullen Ford
Assistant United States Attorney

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
## <u>DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS</u>

Pursuant to Sixth Circuit Rule 30(b), the following filings from the district

court's records are designated as relevant to this appeal:

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Docket Sheet, Northern District of Ohio, Case No. 3:22CR274 | N/A | N/A |
| Indictment | 11 | 85-89 |
| Transcript of Green's Change of Plea Hearing Held on 10/17/23 | 66 | 586 |
| Sealed Victim Impact Statement | 108-1 | 1554-1801 |
| Government's Sealed Supplemental Sentencing Memorandum (Green) | 125 | 2489-95 |
| Hovanec's Sealed Sentencing Memorandum and Attachments | 128 | 2542-98 |
| Government's Sealed Sentencing Memorandum and Attachments (Hovanec) | 129 | 2599-2907 |
| Hovanec's Sealed Presentence Report | 135 | 3100-24 |
| Green's Sealed Presentence Report | 136 | 3125-55 |
| Hovanec Judgment | 137 | 3156-62 |
| Green Judgment | 138 | 3163-68 |
| Green's Notice of Appeal | 144 | 3214-15 |
| Hovanec's Notice of Appeal | 147 | 3221-23 |
| Transcript of Green's Sentencing Hearing Held on 10/1/24 | 160 | 3258-484 |

| | | |
|---|---|---|
| Restitution Order (Green) | 161 | 2485-90 |
| Green Amended Judgment | 162 | 3491-96 |
| Transcript of Hovanec's Sentencing Hearing Held on 10/1/24 | 163 | 3497-715 |
| Green's Notice of Appeal | 164 | 3716-17 |